MANUFACTURERS HANOVER
TRUST COMPANY
v.
The UNITED STATES.

No. 421–74.

United States Court of Claims.

Dec. 13, 1978.

Robert D. Witte, Bronxville, N. Y., atty. of record for plaintiff; Alan M. Lestz and Witte & Witte, Bronxville, N. Y., of counsel.

Ray Goddard, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and KASHIWA, and KUNZIG, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

PER CURIAM.

This case comes before the court on defendant's request for partial review, pursuant to Rule 54(b)(3), of the recommended decision of Trial Judge John P. Wiese, filed November 29, 1977, in accordance with Rule 166(c), on plaintiff's motion and defendant's cross-motion for summary judgment. Additionally, defendant urges this court to adopt the decision of the Trial Judge as the basis for its judgment in this case as to the remainder of the Trial Judge's opinion since neither party has filed a request for review thereof by the court, and the time for so filing pursuant to the Rules of the Court has expired.

■ The sole issue on which review has been requested is whether a bona fide assignee under the Assignment of Claims Act of 1940 (the Act) has standing to seek Wunderlich Act review in its own name. However, in light of the fact that the Trial Judge held, and neither party has excepted, that plaintiff *was not* a bona fide assignee under the Act and thus lacked standing to seek review of the claim in question, both parties at oral argument and in their briefs conceded that the issue is moot. It is clear that this court is " 'not empowered to decide moot questions or abstract propositions.' " *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971) *citing United States v. Alaska S.S. Co.*, 253 U.S. 113, 116, 40 S.Ct. 448, 64 L.Ed. 808 (1920). Accordingly, we therefore deny defendant's request for partial review and vacate that portion of the Trial Judge's decision pertaining to a bona fide assignee's standing to seek Wunderlich review.

Upon consideration of the remainder of the Trial Judge's decision, without oral argument,* we hereby affirm and adopt the decision, as modified, as the basis for our judgment in this case. Therefore, plaintiff's motion for summary judgment is denied and defendant's cross-motion for summary judgment is granted, and the petition is dismissed.**

Trial Judge Wiese's opinion, as modified by the court is as follows:

* Oral argument was directed only at the request for review, not to any other portions of the Trial Judge's opinion.

** The Trial Judge's decision while dispositive on the standing issue, also discusses the merits of plaintiff's claim. Since neither party has excepted to the merits portion of the decision, we include it, albeit dicta, as part of the Trial Judge's opinion.

This is a Wunderlich Act appeal.[1] At issue are claims for equitable adjustment said to be due for increased performance costs incurred by I. D. Precision Components Corporation, the contractor-assignor, on account of manufacturing changes alleged to have been made necessary in order to meet Government-ordered revisions in a ballistic test applicable to the two ordnance contracts in question. Plaintiff, Manufacturers Hanover Trust Company, a banking institution, is the assignee of the contract proceeds.

A threshold issue in the case centers on the bank's appearance here as the claimed real party in interest. The bank was not a party in the proceedings below before the Armed Services Board of Contract Appeals (the board). The case, when presented there, had been initiated by, and was prosecuted solely for the use and benefit of the contractor, I. D. Precision Components Corporation. The assignments to the bank, pursuant to which this appeal was later brought, took place after the board proceedings had been concluded and after the decision, rejecting the contractor's claims, had been issued.

This change in identity of the moving party—from the contractor in the suit below to the bank as the plaintiff in this court—has prompted the Government first to raise a jurisdictional argument with regard to plaintiff's claim. Specifically, the Government contends that, as plaintiff-assignee, the bank is not a bona fide assignee within the meaning of the relevant statute, the Assignment of Claims Act of 1940,[2] and

thus lacks standing to seek Wunderlich Act review in this case. Should the Government prevail under this contention, then, in ordinary circumstances, that would be sufficient to terminate the appeal. However, for the sake of economy, both from the court's point of view and that of the parties, this opinion will address, as the parties' briefs have done, both facets of the case—the jurisdictional issue and the case on the merits.[3] On both branches of the suit the result favors the Government.

## I. The Jurisdictional Issue

A. The facts relevant to the jurisdictional issue are as follows.[4] The contracts in question were awarded on June 16, 1965 and June 30, 1966.[5] Both were fixed-price contracts calling for a combined delivery of approximately 2.2 million artillery shell boosters for a total price of $4.8 million. Deliveries under the contracts were completed in October 1967 and February 1968.

Manufacturers Hanover Trust Company entered the picture on December 10, 1965. On that date it issued its first loan to the contractor in the amount of $50,000. Thereafter, and continuing through at least February 1968 (the completion date of the last awarded contract), the bank made monthly loans to the contractor under what plaintiff has referred to as a "roll-over" account, that is, an account which required the borrower (the contractor) to repay the outstanding loan balance at the end of each month or else negotiate a new loan to cover any amount that remained due. Regarding

1. The statutory reference is: 41 U.S.C. §§ 321–22 (1970). The case on appeal is: *I. D. Precision Components Corp.*, ASBCA No. 12828, 73–1 BCA ¶ 9783.

2. 31 U.S.C. § 203 (1970) and 41 U.S.C. § 15 (1970).

3. This should not be taken as an endorsement of the approach which the Government has adopted in its treatment of the issues in this case. The trial division's authority was not meant to encompass suits which, from the start, are seen to be amenable to disposition (either in whole or in major part), through the resolution of a question of law. Hence, the better practice here would have dictated that

the Government's jurisdictional defenses be presented through the vehicle of a dispositive motion. That would have served to bring the matter before the Appellate Division for a *final* decision in the shortest possible time and with the least expenditure of effort for all concerned.

4. There was, of course, no record made before the board on these issues. The facts given are those recited in the parties' briefs and in the accompanying affidavits.

5. These two contracts were designated, respectively, as: Contract DA–11–173–AMC–385(A) and Contract DA–11–173–AMC–975(A).

this course of borrowing, an affidavit furnished by one Stanley A. Samuels (a vice president of the bank since 1972) states the following:

5. Upon information and belief, all loans made to I.D. [the contractor] during the period 1965 through 1968 and thereafter were for the purpose of financing the operations of I.D., including the government contracts which are the subject of this action. As a matter of business practice, plaintiff's representatives would have reviewed and considered all outstanding government contracts as a source of repayment. The proceeds of such contracts are reliable.

Notwithstanding the foregoing, it is clear that the bank had not been assigned any of the proceeds from the two contracts in question during the time those contracts were in performance. Rather, during that time, the right to the subject proceeds had been assigned to another banking institution, the Long Island Trust Company.[6] This second bank did not relinquish these assignments in its favor until December 28, 1972—long after the instant contracts had been completed and more than one month after issuance of the administrative decision which the court is now being asked to review and reverse.[7]

The release of the assignments in favor of Long Island Trust Company and their subsequent reassignment to Manufacturers Hanover Trust Company was the second step taken in a new loan transaction, a consolidation loan in the amount of $1,300,-000, entered into between the contractor and Manufacturers Hanover Trust Company on December 13, 1971. On that date, these parties executed a loan agreement (referred to as a "credit agreement") whose terms contained, among others, a provision obligating the contractor to remit to the bank "all proceeds of its pending claim against the United States Government, claim # ASBCA—case # 12828" such proceeds to be applied by the bank to the payments of interest due under the terms of the loan agreement. In other words, at this point in time, the contract proceeds had been promised to, but had not then been assigned to, the bank.

The indicated second step in this consolidation loan transaction took place in October 1972. At this time, the parties executed a security agreement which, in essence, provided for the assignment to the bank of all the contractor's receivables. Part of this security agreement contemplated release, by the Long Island Trust Company, of its outstanding right (as assignee) to the proceeds of the two contracts in issue. This planned release was carried out in December 1972,[8] and, on December 28, 1972, the Government was notified of the reassignments of the contract proceeds in favor of Manufacturers Hanover Trust Company. Notice of the reassignments was acknowledged by the Government in February and June 1974. Thereafter, the bank commenced this appeal.

■ The Government's first contention is that plaintiff's claim is jurisdictionally barred since plaintiff is not a bona fide assignee under the Assignment of Claims Act and thus lacks standing to assert the claims in question. In *First National City Bank v. United States*, 548 F.2d 928, 212 Ct.Cl. 357 (1977), it was held that, in order for a lending institution to achieve the status of an assignee under the Assignment of Claims Act of 1940, it had to be shown that the monies which that institution had advanced to the contractor were actually used in, or at least made available for, the per-

---

6. Regarding these assignments to Long Island Trust Company, the record provides no facts concerning either the time or the circumstances under which the assignments came into being. It is not known whether these assignments were the initial assignments or perhaps reassignments. Likewise, it is not known whether they were contemporaneous with new monies being advanced by Long Island Trust Company

or whether they had been given as security in favor of a pre-existing indebtedness.

7. The board's decision was issued on November 15, 1972.

8. Except to the extent noted, the circumstances surrounding the release are not further spelled out.

formance of the contract(s) in question. It is precisely this element which is missing from the facts presented here.

That the loan in question (the loan of December 13, 1971) and the assignments related thereto under which plaintiff now brings its claim, did not contribute the funds used in the performance of the present contracts, is plain. Both the loan and the assignments were transactions that took place long after the contract performance had been completed. Nevertheless, plaintiff contends that its earlier loans to the contractor (meaning, the monthly loans which first began in December 1965) were used in the performance of the subject contracts but were not then secured by contemporaneous assignments because such assignments had been given to the Long Island Trust Company. Thus, argues plaintiff, when Long Island Trust Company later relinquished these assignments, and the contract proceeds were then reassigned to plaintiff, plaintiff was simply securing its antecedent loans on these same contracts.

■ The legal proposition that plaintiff advances is a sound one—the Act does not condition the validity of an assignment on a requirement that it be given contemporaneously with the advancement of the funds that it is meant to secure. However, there is a problem with the facts offered in support of the proposition. The terms of the December 13, 1971, loan agreement specified that the proceeds of that loan were to be applied to two basic purposes: part of this money was to be used to discharge old debts (including, among these, $876,100 still due plaintiff) and the remainder, approximately $300,000 was to accrue to the borrower for future use. The significant point is that the amount of old loans still due plaintiff, namely, $876,100, was identified in the credit agreement as comprising an in-

debtedness all of which had been previously secured by assignments of Government contracts.[9] Since the credit agreement, by its very terms, identified *all* of the contractor's indebtedness to the bank as being *then* secured by *existing* assignments, there is no room for the contention plaintiff now makes, namely, that it took the assignments in question as security for still outstanding earlier loans whose proceeds had been applied to the present contracts. From what appears, that might never have been the case at all. But, assuming otherwise, the best that could now be said is that the loans on the contracts in question were repaid before the December 13, 1971 loan; in short, long before the assignments in question came into being.

Given these facts, plaintiff cannot avail itself of the benefits of the Assignment of Claims Act of 1940. The assignments it received were not given *to secure* loans relating to the present contracts, or, for that matter, to any other previously unsecured Government contract loans. Logically, these assignments can now only be linked to the "uncommitted" portion of the December 13, 1971, loan—meaning, the approximate amount of $300,000 which accrued to the contractor for his unrestricted use. What application was made of this uncommitted money is not revealed.

■ The same reasons which bar plaintiff from claiming the status of a bona fide assignee in its own right also preclude its claiming that status through derivation from the prior assignee—the Long Island Trust Company. Nothing in the facts would permit the court to say that Long Island Trust Company originally funded the contracts in question; similarly, there is nothing in the facts to suggest that it was plaintiff that provided the funds which, in

---

**9.** Paragraph 1.4 of the credit agreement, entitled, Use of Proceeds, stated in relevant part as follows: "Simultaneous with the execution of this Agreement, the Borrower shall pay to the Bank $997,568.44 for the following purposes: (i) $876,100.00 shall be credited to the Borrower's current indebtedness to the Bank secured by prior assignments of government contracts, and shall constitute payment in full of said indebtedness; (ii) $55,871.00 shall be credited to Borrower's current indebtedness to the Bank, reflected in the Bank's accounts # 1000–437–23 and 100–453–86, and shall constitute payment in full of said indebtedness; * * *." [The remainder of this paragraph listed the names of other creditors and the amounts each was to be paid. The total of these directed payments came to $997,568.44.]

turn, were given in repayment of the debts due Long Island Trust Company. Absent proof on each of these essential points, there exists no basis for considering plaintiff a reassignee.

Finally, nothing can be made of plaintiff's contention that the Government waived any imperfections in the assignments through its acknowledgment, in February and June 1974, of the notice of assignment which plaintiff had forwarded more than a year earlier. No intervening course of dealing between plaintiff and Government is alleged; indeed, nothing more is claimed than that the Government belatedly acknowledged receipt of plaintiff's letter. It is difficult to see how through such action alone, in itself nothing more than administrative routine, the legal equivalency of waiver has been established.

■ Plaintiff maintains, however, that such a result is supported by the court's earlier decisions in *Central National Bank of Richmond v. United States*, 91 F.Supp. 738, 117 Ct.Cl. 389 (1950), and *Produce Factors Corp. v. United States*, 467 F.2d 1343, 199 Ct.Cl. 572 (1972). The reliance on these authorities is misplaced. The statements therein made, to the effect that the Government is entitled to no more than a reasonable time in which to determine the validity of an assignment (in order to be able, for good reason, to thereafter avoid it) have relevance only to those particular situations where (i) by the Government's own account contract proceeds remain owing, and, (ii) notice of a competing claim to those proceeds (*i. e.*, the assignee's claim) has been given. In these circumstances, where the Government is a stakeholder, it may not frustrate the purposes of the assignment statute and defeat the assignee's rights thereunder by delaying action on the assignment and, in the interim, causing payments to be made instead to the contractor-assignor. The Government's duty to act

with fair dispatch when notice of an assignment has been given issues out of its basic obligation to see to the proper payment of the contract proceeds.

Such considerations were not present in this case. Plaintiff's notice of assignment was transmitted in December 1972—literally years after contract performance had been completed and final contract payments had been made.[10] The possibility of an erroneous disbursement of contract proceeds no longer existed. To insist that even under these circumstances the Government must move promptly when notice of an assignment has been given would amount to an unwarranted extension of its administrative obligations under the contracts.

■ There are no facts that would establish plaintiff's waiver argument and no reason, apart from such absent facts, to require such a result as a matter of law. Plaintiff was not a bona fide assignee under the Assignment of Claims Act of 1940 and no lack of timely action on the part of the Government can now change that status. Therefore, since plaintiff is not a bona fide assignee, it lacks standing to assert the claims in question.

## II. The Merits

■ A. On the merits of the appeal, plaintiff fares no better. The contracts, as noted, involved the manufacture of artillery shell boosters. This device, which is assembled to a fuse, has a two-fold function: first, it serves as a safety mechanism that delays the arming of the shell and thereby prevents its premature firing; second, it houses the primer (or detonator) which, when activated by the fuse, initiates the process which produces the explosion of the artillery shell.

The contracts prescribed several tests which the boosters had to meet.[11] Among these were two ballistic tests, one designed

---

10. The final payment dates were April 18, 1968, on contract DA–11–173–AMC–385(A) and, on Contract DA–11–173–AMC–975(A), March 9, 1970.

11. Insofar as here relevant, the two contracts, and the tests which each prescribed, were identical. The tests were those set out in the applicable military specification, MIL–B–46654A(MO), 10 September 1964, as amended, 4 January 1965.

to insure that the booster did not arm too quickly and thereby cause premature explosion of the round (the artillery shell), the other to insure that the booster would arm to permit explosion. At the commencement of these contracts, and for some months thereafter, these two tests were carried out in the following fashion. To detect premature arming, a specified number of boosters, randomly selected from each lot, were assembled to an M48A3 fuse and then fired from a 75 mm gun against a one-inch plywood bursting screen stationed 200 feet from the muzzle of the weapon. The absence of an explosion at time of impact would signal that the booster had not armed prematurely. This test was called an impact non-function test. In the second test—that designed to insure that the units would arm—a specified number of boosters were again randomly selected from the lot, were assembled to an M–500 series fuse (a fuse which bursts either in the air or upon impact), and then fired from a 76 mm gun. Explosion of the round, either in the air or upon impact, would indicate that the booster mechanism had achieved the armed position. This test was referred to as the air burst test.

In the course of performance, it developed that the Government's inventory of M–500 series fuses as well as its inventory of 76 mm guns were rapidly being depleted. This in turn, dictated that a different fuse and weapon combination be substituted for use in conjunction with the air burst tests being carried out by the Government under its several booster contracts. In lieu of the M–500 series fuse, the Government decided to use an M–548 fuse which, unlike the earlier fuse, was strictly a point detonating fuse—one only capable of functioning upon impact. And, in lieu of the 76 mm gun, it decided to use a 105 mm gun.

Both of these substitutes found their way into the change order in question in this case—Engineering Order A60509 which was issued unilaterally by the Government on September 1, 1966.[12] In addition to the changes already described, this change order also called for one additional substitution, namely, that in lieu of the previous air burst test, the arming of the booster was now to be verified by explosion of the round upon impact with a one-inch plywood screen to be located 400 feet from the muzzle of the weapon. The engineering order made no change in the impact non-function test. Thus, after the change came into effect, there were two target impact tests—one involving a target stationed at 200 feet from the weapon muzzle to test premature arming of the booster (no explosion allowed); the other involving a target stationed at 400 feet from the weapon muzzle to test proper arming of the booster (explosion required).

From the Government's point of view, the engineering order was not viewed as one that would necessitate any changes in the contractor's method of production. The purpose of the order, so stated in its text, was simply "to delete testing requirements which required use of M500A1 or M501A1 Mechanical Time Fuzes." However, the contractor allegedly saw the matter differently. The imposition of a distance requirement (namely, explosion at 400 feet), in lieu of the earlier requirement (where explosion could occur either in the air or upon ground impact—each without a specified distance limitation) was taken by the contractor as the equivalent of an arming time requirement. It was this interpretation of the change, joined with the belief that the boosters then being produced would not be able to satisfy the 400-foot requirement, that prompted the contractor to halt production, rework certain parts, make substitutions for others, and, introduce new production procedures—all to improve product quality. It was for the recovery of the costs associated with this redirection of effort that suit was commenced below.

B. What defeated the contractor's case before the board and what compels affirmance of that result here is that the contractor's proof failed to establish that, absent

---

12. The order was issued as modification 2 to Contract DA–11–173–AMC–975(A) and as modification 3 to Contract DA–11–173–AMC–385(A).

the production changes which it introduced, the boosters would not have been able to pass the revised ballistic test. On this essential point, the proof was sparse and not enough to prevail. To begin with, the testimony established that the contractor did not actually know the arming time of the booster when subjected to the high spin rates achieved at weapon velocities. Rather, what triggered the contractor's response to the change order was the fact that the booster mechanism exhibited a slowness to arm, occasionally up to a minute and a half, when subjected to the 2,000 rotations-per-minute (r.p.m.) spin test that was conducted on each booster assembly as part of the normal production sequence. And this, coupled with the fact that the contractor had deliberately geared its production to achieve what it considered to be a slow arming mechanism (this in order to assure success at the 200-foot impact non-function test) led to the conclusion that product improvement would be necessary in order to meet the assumed changes in ballistic criteria set out in the change order. Such then was the sum of the contractor's proof on this point.

That the contractor had based its judgment on a set of erroneous assumptions was made plain. The Government's testimony brought out that the 2,000 r.p.m. spin test was not intended, nor under these contracts mechanically so designed, to determine the arming speed of the booster mechanism. Its purpose was only to insure that the assembly would arm; not the time in which it did so. That testimony went on to say that any hesitancy to arm that might have been observed during the 2,000 r.p.m. spin test was a rare occurrence and then generally due to unusual high friction drag that ordinarily would be traceable to excessive foreign matter, improper finishes on a part, oversized parts, or even malassembled parts. However, even with some of these conditions present, for example, foreign matter, it was explained that the significantly higher spin levels achieved during the 400-foot screen test firings (13,500 r.p.m.) would impart a driving force 44 times greater than that present during the

2,000 r.p.m. spin test and thereby cause any frictional drag to become negligible. The spin level, in other words, determined the arming time of the booster. From these several points, there followed the conclusion—given in the testimony and restated by the Board—that there was no connection at all between slow arming, as observed during the spin test, and the arming speeds that would be realized during the 400-foot screen test. From all of this the board assessed the contractor's case in these terms:

> We are of the opinion that the appellant has thus, in its own case, failed to establish a reasonable basis for the changed procedures it initiated in anticipation of the changed ballistic test. All it has really shown is a "feeling" (a word repeated in Mr. Mitchell's testimony) and a "belief" as Mr. Dinstman testified, that changes were necessary to meet the 400 foot screen test. They made no inquiry of the Government about arming time or distance and made no effort themselves to determine what it was or should be. [73–1 BCA at 45,699.]

The Board did not rest its decision only upon the want of proof in the contractor's case-in-chief. It went on to further support the result it arrived at by relying upon certain ballistics analyses—so-called Bruceton tests—which revealed the arming time of the booster mechanism. It was from this data that the Government was able to specify with assurance that the arming time of the booster mechanism would be accomplished within the stated distance of 400 feet.

Much is now made of the board's reliance on this data. For one thing, it is pointed out that the data upon which the Government relied originated in test firings that used a 75 mm weapon and thus the application of that data to the weapon used in the 400-foot screen test, a 105 mm weapon, depended upon extrapolation by formula. Also—and this is the major point that is raised—the contractor was never made aware of the fact that it was this Bruceton test data upon which the Government had

relied when it revised the air burst test. The deficiencies that plaintiff attaches to all of this is that the board erroneously attributed to the contractor a knowledge which it (the contractor) simply did not have and, on that ground, denied the merits of the claim. But for that erroneous assignment of knowledge, so the argument goes, the contractor's response to the change order would have been a reasonable response entitling it to recover the costs it now seeks.

The argument misreads the board's decision as well as the case law offered in support of it. The contractor lost before the board because it failed to prove its case. The unilateral response to the change order was taken in the face of what clearly should have been recognized by the contractor as a serious limitation in its own knowledge, namely, that it did not know the arming time of the booster under conditions of actual use. In other words, it acted on its own to modify a function whose performance characteristics, to start with, it knew little about. This alone was enough to defeat the claim for absent any better explanations to support this course of action than those given here, it could never be said that the contractor had acted reasonably. Thus, even if the Government's test data had not come into the record, the outcome of the appeal would have been just the same.

The several decisions that plaintiff cites do not set out legal principles that argue for a different result; in fact, they only underscore what is lacking in this case: a contractual setting in which altered circumstances dictated a *reasonable* need for extra effort on the contractor's part. Thus, in *L. W. Foster Sportswear Co. v. United States*, 405 F.2d 1285, 186 Ct.Cl. 499 (1969), the court recognized a right to additional compensation for efforts expended to overcome certain deficiencies in manufacturing specifications which the closely related predecessor procuring activity had repeatedly resolved by permitting the contractor to deviate from stated requirements. The emphasis placed in that decision on the contractor's "reasonable belief" as the test of contractual expectations (the point plaintiff stresses) has no counterpart in the instant facts. The *Foster* decision may not be read apart from the pattern of previous conduct between the same parties for it was this conduct which led the contractor to assume that deviations from specifications would remain the Government's mode of handling recognized problems in the contract specifications. The other two cases relied on, *R.E.D.M. Corp. v. United States*, 428 F.2d 1304, 192 Ct.Cl. 891 (1970), and *Roscoe-Ajax Constr. Co.*, ASBCA No. 12110, 71–1 BCA ¶ 8828, are likewise distinguishable. The self-help procedures which the contractor in *R.E.D.M.* had pursued, and which this court later recognized as the basis for an equitable adjustment, were undertaken in order to determine the cause of, and to correct repeated failures in, product malfunction that existed from the very outset of the contract. Only by dint of the contractor's efforts was the source of the malfunction traced to a deficiency in the applicable specifications. The difference between that situation and the case at hand is apparent: the contractor in *R.E.D.M.* responded to an actual problem; the contractor in this case to an imagined one. The same holds true of *Roscoe-Ajax*. There it was the Government's allegations of defective workmanship and its retaining of contract sums which prompted the contractor to initiate a study to determine the reason for the claimed deficiencies in certain hydraulic equipment which it (the contractor) had installed. The Government later receded from its claim (when it learned through the contractor's study that the source of the problem was in the misuse of the equipment) and the board held that the costs of the study were chargeable to the Government. Plainly, none of the cases cited can be read to stand for the proposition that the Government's imposition of "an apparent additional burden" (these being the words used in plaintiff's brief) is in and of itself enough to make the Government the party responsible for shouldering the costs of that burden.

■ The final point that is argued is that the Government should be estopped from

denying responsibility for the costs in question on the theory that its representatives (the plant inspector and the project engineer) had knowledge of plaintiff's actions yet took no steps to discourage them, not even to advise that they were unnecessary. The Government's silence in the face of this situation is said to now preclude its right to disavow liability.

The trouble with this argument is the facts. Nowhere is it shown that the Government had actual and contemporaneous notice that the contractor's work stoppage and changeover in procedures—events which actually were initiated even before the change order had been formally issued—were activities prompted by the anticipated issuance of that order. The board made no findings to such effect and the several transcript references that are now offered in support of the point do not at all disclose that the Government was aware, or even that it should have been, of the reasons which supposedly motivated the contractor's actions. The only point that emerges from the record with certainty is that the project engineer learned after the fact, during a visit to the plant in November 1966, of the contractor's interest in treating the change order as a basis for additional compensation. To the inquiry that was then made by the contractor, the project engineer advised that, in his opinion, there were no grounds for additional compensation since the change order itself had contemplated no change in existing requirements. It was shortly thereafter that the contractor filed its claim to recover the costs which it had incurred in August and September 1966. On this record, the estoppel argument cannot be sustained for the facts that would support it—notice and knowledge on the Government's part—have not been shown to exist.

In its entirety, the board's denial of the contractor's claims was correct.

## CONCLUSION

Accordingly, plaintiff's motion for summary judgment is denied, defendant's cross motion for summary judgment is granted, and the petition is dismissed.