**AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 215–86C.**

United States Claims Court.

Nov. 13, 1990.

Edward J. Whalen, Chicago, Ill., for plaintiff.

Mary Mitchelson, Washington, D.C., with whom were Director David M. Cohen and Acting Atty. Gen. Stuart M. Gerson, for defendant.

## OPINION

ROBINSON, Judge:

This is a suit brought under the Tucker Act, 28 U.S.C. § 1491, for damages for breach of contract. The matter is before the court on the parties' cross-motions for summary judgment. The Department of Defense, Defense Logistics Agency (DLA) awarded a contract to St. Bernice Manufacturing Company (St. Bernice) to manufacture 84,000 sleeping bags. American National Bank and Trust Company of Chicago (plaintiff or American) by its motion seeks a determination that as assignee of that contract's proceeds it is entitled to a judgment in its favor for $218,277.94 erroneous-

ly paid to St. Bernice. Defendant, by its motion, opposes any award to plaintiff and seeks a determination that there was not a valid assignment of the contract to plaintiff and that the defendant is entitled on its counterclaim to recover a total of $764,897.76 erroneously paid to plaintiff.

For the reasons which follow, the court will deny plaintiff's motion for summary judgment and will grant in part defendant's motion for summary judgment. However, with respect to defendant's counterclaim, the court has determined that resolution of the issues presented by that counterclaim will require further proceedings which will be addressed in a separate order.

### Factual Background

In 1976 St. Bernice executed a security agreement covering its accounts receivable and opened a line of credit at Mercantile Bank of Chicago (Mercantile). By the fall of 1979 St. Bernice was indebted to Mercantile for $257,552.52. This debt was evidenced by St. Bernice's promissory notes which were issued on various dates and secured by the personal guarantees of David Goldberg, President of St. Bernice, and his wife Marjorie Goldberg. Thereafter, one promissory note dated September 3, 1979 was issued by St. Bernice in the amount of $257,552.52 to replace the prior notes. This note was collateralized by the same security agreement and the personal guarantees of David Goldberg, Edward Rivera, and Frank Diaz, which were executed at various times between 1979 and 1981.

Mercantile sold its assets to American in the fall of 1979 and went out of business. The secured loan to St. Bernice was included in the sale. Mercantile Holdings, Inc., (Mercantile Holdings) was formed to assume the unsold assets and obligations of Mercantile when the latter ceased doing business in December 1979. Under the terms of the purchase agreement, American had the right to have Mercantile Holdings repurchase the uncollected balance of any loan sold. About the same time that American acquired St. Bernice's debt, St. Bernice defaulted on its September 3, 1979 note to Mercantile.

In the spring of 1980, Nicholas A. Alexander, a Senior Vice President at American, and the loan officer responsible for Mercantile's account with St. Bernice, instituted several collection suits on behalf of American against St. Bernice and Goldberg.[1]

Despite St. Bernice's poor financial condition, the state court proceedings pending against it, and the fact that St. Bernice had never before performed a Government contract, it was awarded DLA Contract 100-80-C-3347 (the DLA contract) on July 22, 1980. This contract provided for an initial quantity of 42,000 sleeping bags to be manufactured for $1,984,920. However, in August 1980, before actual production had commenced, the contract was modified and a set-aside portion was added for the manufacture of an additional 42,000 sleeping bags. This brought the total contract award to approximately $3,969,840.

Goldberg approached American for financing for the DLA contract. During the period July 22 through September 29, 1980, Goldberg met several times with American's Alexander and representatives of Trident Industries (Trident), a supplier of raw textile materials, to discuss financing of the DLA contract. However, American refused to extend any credit to St. Bernice to finance the contract. At that time St. Bernice's accumulated debt to American was about $313,348.47, including interest and legal fees incurred in American's collection attempts.[2] Trident, to which St. Bernice was also indebted from past business dealings, then agreed to provide the

---

1. Case No. 80 CH 3468 *American National Bank and Trust Co. v. St. Bernice Mfg. Co., et al.,* and Case No. 80 L 10601 *American National Bank and Trust Co. v. David Goldberg.* In addition to judgments against St. Bernice, American also obtained a judgment against David Goldberg in Case No. 80 L 10601.

2. None of this amount represented funds advanced, whether directly or indirectly, by American to finance St. Bernice's performance of the DLA contract.

raw materials needed by St. Bernice for the DLA contract, but only if American would agree to forego immediate collection efforts and perhaps capture and distribute the Government's progress payments due to St. Bernice. Thus, subsequent to the award of the DLA contract, American, Mercantile Holdings, St. Bernice, and Trident entered into an agreement dated September 29, 1980 (the September Agreement), which became effective on October 10, 1980. It was to remain in effect until the preexisting indebtedness of St. Bernice was extinguished. It authorized American, in consideration of American's forbearance from its collection efforts, to receive the Government's progress payments and distribute them as follows: Trident, 90 percent; St. Bernice, 5 percent; and American, 5 percent. American's 5 percent would be applied against St. Bernice's indebtedness. Further, the September Agreement required St. Bernice to issue a new promissory note to American for $268,348.37 accompanied by the personal guarantees of Goldberg, Diaz and Rivera, and to make $6,000 monthly payments to American commencing November 10, 1980. It also required Diaz and Rivera to purchase all of St. Bernice's outstanding common stock for $55,000, on or before October 10, 1980. The purchase transaction contemplated that $45,000 of the $55,000 would be forwarded to American in payment of its outstanding legal fees and litigation costs incurred in the state court proceedings,[3] and that within five days of its receipt of the $45,000, American would dismiss its pending state court suits. Also, the September Agreement obligated St. Bernice to assign all of its accounts receivable "due and owing" to it from the Government.

In October 1980, Diaz and Rivera failed to pay the $55,000 under the stock purchase agreement. American promptly declared St. Bernice in default of the September Agreement. Subsequently, on January 19, 1981 American, Mercantile Holdings, Trident and St. Bernice executed another agreement (the January Agreement) which superseded the September Agreement. Although it contained no stock purchase provisions, it was similar to the September Agreement except that the distribution of the proceeds from the DLA contract was changed as follows: Trident, 90 percent; American, 10 percent or double its former percentage. This arrangement left nothing for St. Bernice to cover its operational costs. Although under the January Agreement American was to receive the same $6,000 monthly payment, it contained no provision for payment of American's litigation costs and dismissal of American's state court suits. Thus, the January Agreement which St. Bernice signed to evidence its new indebtedness for $330,528.53 consisted of the amount of the September note ($268,348.37), legal fees and costs ($45,000) and interest for the five month period from September 1980 through January 1981.[4]

While St. Bernice was in default of the September Agreement, American's Alexander, in an effort to capture control of the progress payments due St. Bernice, on October 29, 1980 wrote letters to Bernard Siler, the administrative contracting officer (ACO), and Victor Rivard, the disbursing officer (DO). With these letters he sent copies of the 1976 Security Agreement between Mercantile and St. Bernice and the 1979 assignment of security interest from Mercantile to American. The letters claimed the "assignment of said security interest" by Mercantile to American and sought forwarding to it of all DLA contract progress payments. After Alexander received no response to either letter, he phoned Rivard's office. Thereafter, on November 21, 1980, Siler, not Rivard, acknowledged receipt of Alexander's letter. Later, on December 31, 1980, while Rivard was on vacation, George C. Carpenter, an employee in the disbursing office, also acknowledged receipt of Alexander's letter on behalf of Rivard. Thus, Alexander's two letters were acknowledged and re-

---

3. This amount was the difference between the amount of the new promissory note for $268,348.37 and St. Bernice's total debt to American of $313,348.47.

4. None of the $330,528.53 represented American's funds advanced to finance St. Bernice's performance of the DLA contract, but only a restructuring of St. Bernice's prior debt.

turned to him by or on behalf of both the ACO and the DO.[5] However, at no time was any Government official sent a copy of the September Agreement or otherwise advised of that Agreement which was then in default.

In late January 1981, after making only one progress payment to St. Bernice, DLA's disbursing office changed the payee from St. Bernice to American and began sending progress payments to plaintiff. In May 1981, after four payments (payments 2–5) totalling $683,469 had been sent to plaintiff, apparently Rivard reviewed the file, determined that the documents fell short of meeting the criteria for a valid assignment under the Assignment of Claims Act and ordered that future progress payments be sent directly to St. Bernice. Thus, most of the next series of progress and end item payments totalling $218,277.94 were sent to St. Bernice. American voiced no objection to either the ACO or DO respecting this change in payee from American to St. Bernice. Through what defendant contends was an administrative error, the final six progress and end item payments totalling $81,428.75 went to American. Altogether, American was paid a total of $764,897.76 of the proceeds of the DLA contract.[6]

After commencing performance of the DLA contract, St. Bernice began to fall behind in its production and delivery of sleeping bags required by the DLA contract. In a letter to the ACO dated October 2, 1981, Goldberg advised that St. Bernice's financing arrangement with American and Trident resulted in proceeds being applied to St. Bernice's pre-existing debt and did not leave enough funds to finance production under this contract. However,

Goldberg's letter did not describe the actual terms of the financing arrangement or enclose with it a copy of the January Agreement.

In September, 1981, American declared St. Bernice in default of the January Agreement because St. Bernice had failed to make payments as scheduled. St. Bernice continued to fall further and further behind in its production and delivery of sleeping bags. DLA ceased making progress payments after October 2, 1981. By October 16, 1981 only 27,831 units had been delivered. No further deliveries were ever made. On January 11, 1982, the contracting officer terminated the DLA contract for St. Bernice's failure to deliver and abandonment of the contract.[7]

By final decision dated January 12, 1982, the contracting officer assessed $730,630.01 in unliquidated progress payments against St. Bernice. On October 5, 1983, Rivard sent a letter to St. Bernice demanding payment of these unliquidated progress payments plus $159,947.56 in interest on that amount from January 12, 1982 to September 30, 1983, $90,736 in excess procurement costs and $199,504.78 for Government furnished materials never recouped. None of these amounts has ever been paid by St. Bernice.

In November 1982, Mercantile Holdings reimbursed American in full for the outstanding obligations of St. Bernice by a charge against the reserve established under the 1979 purchase agreement between American and Mercantile.

On April 1, 1986, Mercantile Holdings initiated this lawsuit. Defendant moved to dismiss for lack of jurisdiction because Mercantile Holdings had no privity with the

---

**5.** From the execution of the DLA contract until its termination for default, Paul R. Crossin was the contracting officer. The record does not reflect exactly what authority over the DLA contract Crossin had delegated to Siler, the ACO, or to Rivard, the DO. In any event, Alexander chose not to direct his letter to Crossin. Apparently Crossin was never contacted by anyone from American or St. Bernice.

**6.** Between January 23, 1981 and October 2, 1981, a total of $1,414,932.69 in progress and end item payments were made under the DLA

contract. Of the $764,897.76 American received from DLA it retained $98,157.40, or approximately 12.83 percent. In addition, St. Bernice forwarded to American $55,175.70 or 12.7 percent of the $431,757 which it received directly from the DLA.

**7.** St. Bernice appealed this termination for default to the Armed Services Board of Contract Appeals. On December 28, 1982, its appeal was dismissed with prejudice for failure to prosecute.

United States. Mercantile Holdings represented in its complaint that it had sold its St. Bernice loan to American, that American received an assignment of the DLA contract and that subsequently, in November 1982, Mercantile Holdings repurchased from American the outstanding obligations of St. Bernice. Thus, after briefing of defendant's motion to dismiss, Mercantile Holdings filed a motion to join American as a party defendant and moved the court to realign American as the proper plaintiff. American appeared and requested that it be realigned as plaintiff. Thereafter, American was substituted for Mercantile Holdings as plaintiff and Mercantile Holdings was allowed to withdraw from the lawsuit. American is now pursuing this claim on behalf of Mercantile Holdings since it has been fully reimbursed under the terms of the purchase agreement with respect to St. Bernice's debt and any monetary recovery that it may achieve must be remitted to Mercantile Holdings.

## DISCUSSION

### A. *Summary Judgment.*

Summary judgment is an integral part of this court's rules and when appropriate, the procedure serves a useful function, particularly in isolating and disposing of factually unsupported claims or defenses without the need of a trial. The procedure is useful when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RUSCC 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A movant for summary judgment has the burden of showing the absence of genuine issues as to any material facts. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). Only disputes over material facts, or facts that might significantly affect the outcome of the suit under the governing law, preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A material fact is one which will make a difference in the result of a case. *See Curtis v. United*

*States,* 144 Ct.Cl. 194, 168 F.Supp. 213, 216 (Ct.Cl.1958), *cert. denied* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959). Doubts concerning factual issues are to be resolved in favor of the non-movant. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Neither party has come forward with sufficient facts to establish that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986); *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560 (Fed.Cir.1987). Moreover, the parties have stipulated to a significant number of facts most of which are recited above and, by cross-moving for summary judgment indicate their agreement that no material facts remain in dispute. Further, it is clear from these motions that the primary issues presented for decision, concerning the allegedly putative assignment and the respective rights of the parties to monies paid under the contract, call for conclusions of law. In these circumstances the court finds that the merits of plaintiff's claim are appropriate for resolution by summary judgment. However, further proceedings will be necessary before resolution of defendant's counterclaim will be possible by summary judgment.

### B. *Contentions of the Parties.*

Plaintiff contends that it is a proper party to bring this action. It argues that the validity of this assignment is governed by Illinois law which does not require formal words of assignment or a written document to create an assignment. It alleges that under Illinois law and the Assignment of Claims Act, 31 U.S.C. § 3727 (the Act), the facts in this case indicate that St. Bernice validly assigned its rights to plaintiff to receive progress payments under the DLA contract.

In support of these contentions, plaintiff relies upon the October 1976 Security Agreement, the "explicit" assignment commitments in the September 1980 and January 1981 Agreements, St. Bernice's acquiescence in the assignment, Alexander's letters of October 29 to DLA, Alexander's

subsequent conversation with Siler, Goldberg's October 1981 letter to Robert Ditsler, another ACO, referring to the assignment to American, and DLA's various actions including its investigation, its internal memo and its change of records to reflect that payments should go to plaintiff. Finally, plaintiff relies upon the holding in *In Re Teltronics, Inc.,* 58 Comp.Gen. 619 (1979), to support its argument that a legally valid assignment occurred under the Act.

Alternatively, plaintiff contends that even if there was insufficient compliance with the requirements of the Act, DLA waived plaintiff's compliance with such requirements and thus defendant is estopped from denying the validity of the assignment.

Defendant argues that the complaint should be dismissed because plaintiff has failed to state a claim upon which this court may grant relief. In this regard, defendant alleges that St. Bernice is not indebted to American, that no monies are due St. Bernice under the DLA contract, and that American has no standing to pursue this action on behalf of Mercantile Holdings.

Defendant alternatively argues that if the court finds that plaintiff has stated a claim upon which relief may be granted, that the purported assignment of progress payments to plaintiff is not valid under the Act. In support of this argument, defendant alleges that plaintiff did not advance funds for performance of the DLA contract, plaintiff never provided DLA with a true copy of the instrument of assignment as required by the Act, and the documents plaintiff proffered and relied upon to establish the assignment are not sufficient. Further, defendant argues that these deficiencies could not be, and were not, waived by DLA.

If it is determined that the assignment was valid, defendant contends that American's recovery must be zero or otherwise severely limited because it actually recouped from St. Bernice some of the amounts it now claims to be due from defendant. Defendant argues that, in any

event, under the purported assignment plaintiff was entitled to only 10 percent of the contract payments. Finally, defendant contends that because the assignment was invalid, defendant is entitled to recoup all of the monies wrongly paid by DLA to American.

In response, plaintiff contends that it is a proper plaintiff, that it has standing to bring this action, that no fraud was involved in its receipt of the payments, that the payments were not "wrongly" paid to it, that the Act protects the plaintiff from recoupment by the defendant once the assignment has been recognized, that defendant's failure to notify American of its claim of invalidity should also defeat any recoupment, but in any event defendant has already recouped $584,943.72 of its progress payments of $764,897.76 through St. Bernice's partial performance and that defendant is not entitled to a set off due to St. Bernice's default and indebtedness to defendant.

## C. *Analysis.*

 The first issue presented is whether the complaint must be dismissed for plaintiff's failure to state a claim upon which relief can be granted. See RUSCC 12(b)(4); RUSCC 56. Plaintiff's claim is premised upon its purported status as an assignee to the DLA contract. An assignee's recovery from the United States is limited to the extent of that assignor's outstanding debt to the assignee. *Security Bank & Trust Co. v. United States,* 731 F.2d 861 (Fed.Cir.1984); *Continental Bank and Trust Co. v. United States,* 189 Ct.Cl. 99, 416 F.2d 1296 (1969). When Mercantile Holdings, under the terms of its purchase agreement with plaintiff, repurchased the outstanding balance of St. Bernice's loan from plaintiff, the assignor's (St. Bernice) debt to the assignee (plaintiff) was reduced to zero. Therefore, even assuming that the United States had breached a valid assignment with plaintiff, plaintiff would not be entitled to recover any damages. Plaintiff in its own right has no monetary damage claim to assert against the United

States under the Tucker Act,[8] and therefore fails under RUSCC 12(b)(4) and 56 to state a claim upon which relief can be granted. *United States v. Testan*, 424 U.S. 392, 397–98, 96 S.Ct. 948, 952–53, 47 L.Ed.2d 114 (1976); *United States v. King*, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969).

■ Plaintiff argues that they are not pursuing this claim to recover their own loss rather they premise their claim on a debt which is owed by St. Bernice solely to Mercantile Holdings. Under the terms of their February 17, 1987 Release and Indemnity Agreement with Mercantile Holdings, plaintiffs retained their claim against DLA for DLA's failure to remit to plaintiff all of the payments under the DLA contract, despite Mercantile Holdings indemnification for St. Bernice's loan default. However, what plaintiff retained under that agreement is not a valid or cognizable damage claim under the Tucker Act. Rather, it is a contractual commitment with Mercantile Holdings to recover monies from the Government which can then be applied against the outstanding balance owed by St. Bernice to Mercantile Holdings.

Defendant argues that plaintiff's retained claim is without any value when separated from their contractual commitment with Mercantile Holdings. This argument has merit. Plaintiff's Claims Court action is essentially nothing more or less than an attempt by Mercantile Holdings to do indirectly what it cannot do directly. Thus, Mercantile Holdings, notwithstanding its withdrawal from this suit, seeks to recover monies from defendant, through plaintiff, in a claim which is prohibited under the Act. At best, this claim rests upon a subterfuge, albeit an adroit one, to circumvent explicit prohibitions in the Act.

The Act, 31 U.S.C. § 3727, provides in pertinent part as follows:[9]

All transfers and assignments made of any claim upon the United States, or of any part or share thereof, ... and all powers of attorney, ... shall be absolutely null and void, ...

The provisions of the preceding paragraph shall not apply in any case in which the moneys due or to become due from the United States or from any agency or department thereof, under a contract providing for payments aggregating $1,000 or more, are assigned to a bank, trust company, or other financing institution, including any Federal lending agency: Provided,

\* \* \* \* \* \*

(3) That unless otherwise expressly permitted by such contract any such assignment shall cover all amounts payable under such contract and not already paid, shall not be made to more than one party, and shall not be subject to further assignment, except that any such assignment may be made to one party as agent or trustee for two or more parties participating in such financing;

(4) That in the event of any such assignment, the assignee thereof shall file written notice of the assignment together with a true copy of the instrument of assignment with (a) the contracting officer or the head of his department or agent.

The Act's broad nullification of any voluntary assignment of Government contracts except as allowed by the Act serves a variety of purposes including preventing unrelated third parties not in privity with the Government from acquiring an enforceable interest in claims against it, obviating the investigation of alleged assignments, enabling the Government to deal only with

---

8. American replaced Mercantile Holdings as plaintiff in the instant case when it became clear that Mercantile Holdings was not an assignee of the DLA contract and that there was no privity of contract between Mercantile Holdings and defendant.

Plaintiffs are pursuing this claim for Mercantile Holdings under a Release and Indemnity Agreement for an undetermined fee.

9. Another statutory provision, 41 U.S.C. § 15 provides that an attempted assignment "shall cause annulment of the contract or order transferred." In general, however, the concern of the two statutes and the legal concepts involved in their applicability are the same.

the original claimant, and protecting the United States. *Tucker v. United States*, 7 Cl.Ct. 374, 375–76 (1985). To allow American to pursue this claim for Mercantile Holdings would contravene the fundamental policy considerations which underlie the Act's broad prohibition against assignments of such contracts.

 Plaintiff further alleges that Mercantile Holdings' posture in this case is analogous to that of a subcontractor. However, plaintiff's and Mercantile Holdings' relationship displayed none of the characteristics inherent in such a relationship nor did they fulfill their obligations to the Government required of a contractor and subcontractor when performing under a government contract. Clearly, Mercantile Holdings had no duty to St. Bernice to perform any part of the DLA contract. Nor did it have any obligation to loan money to St. Bernice for the performance of this contract. Moreover, the Government knew nothing of St Bernice's relationship to either Mercantile Holdings or American upon the parties' execution of the DLA contract.

In connection with the subcontracting of work by a contractor, the Government is normally given adequate notice of who the subcontractors are and what work they will perform so that the Government has a reasonable opportunity to object to a particular subcontractor. In this case, however, it is uncontested that American not only revealed nothing of Mercantile Holdings' interest in the DLA contract, but erroneously represented that it was the sole owner of St. Bernice's debt. Additionally, Mercantile Holdings' relationship to American has not resulted in American acquiring the rights of a subcontractor after payment to that subcontractor of its damages. As pointed out by defendant, American has no liability whatsoever to Mercantile Holdings to pay it anything as a reimbursement before pursuing a claim against the Government. Such a payment to a subcontractor or a stated liability is a precondition of a

contractor's suit against the Government on behalf of a subcontractor. *See Severin v. United States*, 99 Ct.Cl. 435 (1943); *J.L. Simmons Co. v. United States*, 158 Ct.Cl. 393, 397–98, 304 F.2d 886, 888–89 (1962).[10]

In *Pan Arctic Corp. v. United States*, 8 Cl.Ct. 546 (1985), a case upon which plaintiff relies, Worthington, the prime contractor entered into a "settlement agreement" with its subcontractor, Pan Arctic, whereby it assigned to Pan Arctic its claims against the Government and presumably resolved the issue of Worthington's liability to Pan Arctic for Pan Arctic's damages. After the court barred Pan Arctic under the Act from pursuing the action in its own right based upon the assignment, the court examined the settlement agreement to determine whether under *Severin v. United States*, 99 Ct.Cl. 435 (1943), Worthington was not completely exonerated and, therefore, could sue on behalf of Pan Arctic. Because the court found Worthington was not completely exonerated under the settlement agreement, the court allowed Worthington to be substituted as the party plaintiff for the subcontractor's benefit. However, in the case *sub judice* American cannot possibly be held liable to Mercantile Holdings for American's failure to recover on its claims against the Government.

In short, under the undisputed facts in this case, there is no possibility of American ever being held liable to Mercantile Holdings for the Government's alleged breach. Under its agreement with Mercantile Holdings, its liability extends only to pursuing (for a fee) Mercantile Holdings' claims against the Government arising out of the DLA contract. Based upon the foregoing analysis, the court concludes that *Pan Arctic* is inapposite, that plaintiff's reliance upon that case and similar precedent is misplaced, and that the *Severin* case is controlling on this issue.

The above analysis shows that plaintiff's complaint has stated no damage claim which it can properly pursue in this court. This court clearly has jurisdiction to assess

---

**10.** American had no liability to Mercantile Holdings pursuant to any agreement prior to the 1987 agreement. The liability flowed in the

reverse direction—from Mercantile Holdings to American under the indemnification obligation arising out of the purchase agreement.

the adequacy of plaintiff's complaint. Thus, the court may not simply order dismissal of this suit without prejudice for lack of jurisdiction. To the contrary, such dismissal, by virtue of RUSCC 12(b)(4) and 56, requires a determination on the merits of plaintiff's claim and therefore that determination is with prejudice.[11] The court finds that on the basis of the above facts, plaintiff's complaint fails to state a claim upon which relief can be granted *United States v. Testan*, 424 U.S. 392, 397–98, 96 S.Ct. 948, 952–53, 47 L.Ed.2d 114 (1976); *United States v. King*, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). The complaint will be dismissed with prejudice.[12]

Since this court has found that defendant has met its burden of showing that plaintiff has failed to state a claim upon which relief may be granted, it need not address the question of whether or not there was a valid assignment under the Act. However, assuming *arguendo* that the court's dismissal is found to be in error, the court will also address the validity of plaintiff's purported assignment.

■ Plaintiff first alleges that the validity of assignments is governed by the general law of assignments, and therefore, Illinois law governs this assignment. Plaintiff argues that under Illinois law no formal words, or even a written document, are necessary to create an assignment. Using plaintiff's argument a purported assignee could claim a valid assignment under the Act without having to comply with the provisions of the Act that require that "... the assignee thereof shall provide written notice of the assignment together with a true copy of the instrument of assignment ..." 31 U.S.C. § 3727. This would clearly

undermine the requirements of the Act. *See Uniroyal, Inc. v. United States,* 197 Ct.Cl 258, 454 F.2d 1394 (1972). The Act specifically prohibits any assignments which do not comply with its provisions. The court finds that general Illinois law governing assignments has no application.

■ Plaintiff next contends that the various documents provided to DLA, including the 1976 security agreement, met the statutory requirements of the Act so as to constitute a legally valid assignment under the Act. In order to prove the existence of a valid statutory assignment, plaintiff must show compliance with each of three criteria—that (1) it is a qualified financial institution; (2) it loaned money or at least made money available for the performance of the DLA contract; and (3) true and correct copies of the documents of assignment were provided to both the contracting and disbursing officers. *Manufacturers Hanover Trust Co. v. United States,* 218 Ct.Cl. 563, 590 F.2d 893 (1978).[13]

■ The facts affirmatively show that plaintiff did not loan any money or make any of its funds available for the performance of the DLA contract. To the contrary, under the ingenious four party "financing" arrangement described in the January Agreement, not one penny of Mercantile's, Mercantile Holdings' or American's funds actually went toward the purchase of raw materials for the DLA contract whether initially or during subsequent debt restructuring efforts. Thus, since plaintiff has failed to prove compliance with the second criteria set forth above, the court finds that a valid statutory assignment under the Act did not occur. *Manufacturers*

---

**11.** *Do–Well Machine Shop, Inc. v. United States,* 870 F.2d 637, 639–40 (Fed.Cir.1989); *Bray v. United States,* 785 F.2d 989, 992 (Fed.Cir.1986). Failure to state a claim in contravention of RUSCC 12(b)(4) calls for judgment on the merits and not a dismissal for want of jurisdiction. Dismissal on the merits carries *res judicata* or issue preclusion efforts. *Do–Well Machine Shop, Inc. v. United States,* 870 F.2d 637, 639–40 (Fed.Cir.1989). Therefore, defendant's motion to dismiss is deemed to be presented pursuant to RUSCC 12(b)(4). It will be treated as one for summary judgment, and disposed of under RUSCC 56.

**12.** A dismissal for lack of jurisdiction would also necessarily require a dismissal of defendant's counterclaim. However, the court's dismissal under RUSCC 12(b)(4) and 56 on defendant's motion for summary judgment does not require this result. *Joseph Morton Co. v. United States,* 3 Cl.Ct. 780 (1983).

**13.** It is undisputed that American meets the first of these criteria.

*Hanover Trust Co. v. United States*, 218 Ct.Cl. 563, 569–71, 590 F.2d 893, 896–97 (1978); *First Nat. City Bank v. United States*, 212 Ct.Cl. 357, 366–68, 548 F.2d 928, 934–35 (1977).

■ The documents which plaintiff alleges it forwarded to DLA with Alexander's October 29, 1980 letters are the 1976 Security Agreement between Mercantile and St. Bernice and the 1979 assignment of security interest from Mercantile to American. A close examination of the first of these documents, the 1976 Security Agreement, reveals that it assigned no assets to Mercantile. Although it granted Mercantile a security interest in St. Bernice's accounts receivable, including the right to *collect* and *manage* St. Bernice's accounts receivable and the right to direct account payments to Mercantile, it did not grant to Mercantile ownership in or title to the proceeds of St. Bernice's DLA contract. Plaintiff relies upon *In Re Teltronics, Inc.*, 58 Comp.Gen. 619 (1979), to support its argument that the 1976 Security Agreement constituted a document of assignment within the contemplation of the Act. There, however, the agreement's language was unequivocal. It stated that the contractor "hereby grants a security interest in, *sells, assigns, transfers*, deposits, pledges, and *sets over* to the Bank all it[s] right, title and interest in and to each and every account of the [contractor]." (Emphasis added.) That language is a far cry from the permissive language of the 1976 Security Agreement. The court concludes that plaintiff's reliance upon *In Re Teltronics, Inc.* is misplaced. Therefore, the court finds that since neither the 1976 Security Agreement nor the subsequent assignment of that agreement to American in 1979 constituted an assignment to American of St. Bernice's DLA contract proceeds, the furnishing of copies of those agreements to

defendant was not in compliance with the above third criteria of the Act.[14]

■ Reliance by plaintiff upon the September 1980 and January 1981 Agreements, to show compliance with the third requirement of the Act will not suffice either. Admittedly, American failed to supply copies of these documents to DLA, assuming that they are actual documents of assignment.[15] This failure alone is sufficient to defeat any contention that plaintiff has complied with the third clear requirement of the Act.

■ Plaintiff contends that even if it did not comply with the requirements of the Act, defendant waived plaintiff's compliance by making payments to American after receiving notice of the "assignment." American's position apparently is that it was not required to reveal the details of the financing arrangement in order for the defendant to have waived the requirements of the Act and, further, that the Government cannot repudiate this waiver since it could have fully investigated the assignment before honoring it but did not do so.

These arguments have absolutely no merit. Plaintiff's action in not providing complete copies of the September 1979 and January 1980 Agreements effectively hid from DLA the true nature of the financing arrangement. Under that arrangement rather than American advancing funds toward St. Bernice's performance, Trident, acting as a factor, contracted to supply raw materials to St. Bernice; American was to receive 10 percent of all progress payments, not as a fee for rendering a disbursing service, but as payment toward a very large pre-existing debt; Trident was to receive 90 percent of these payments but with the right to apply a portion of its share of these funds to reduce St. Bernice's pre-existing debt to it; and St. Bernice was to commence paying to American $6,000 in additional monthly payments.[16] Knowl-

---

14. Neither the 1976 Security Agreement nor its subsequent assignment to American could have had in contemplation an assignment of the DLA contract, since that contract was not even awarded until July 1980.

15. The court doubts that these documents, in any event, constituted actual assignments. For

example, the January 1981 Agreement on its face is nothing more than an agreement to assign and not an assignment.

16. The record contains no information concerning St. Bernice's monthly operating costs or how it could pay those costs, particularly in view of its large pre-existing debts to American and Tri-

edge of all of these highly material facts by the *contracting* officer as well as the disbursing officer would have been necessary before any waiver argument would have merit.[17] Although there were payments made directly to plaintiff, such payments were made in error because of plaintiff's nondisclosure of these critical factors.

The Act is designed to protect the Government from secret assignment arrangements, to prevent possible multiple claims and to make unnecessary the investigation of alleged assignments. *See McKenzie v. Irving Trust Co.,* 323 U.S. 365, 369, 65 S.Ct. 405, 407, 89 L.Ed. 305 (1945); *Tucker v. United States,* 7 Cl.Ct. 374, 375–76 (1985). The court is convinced that the facts in this case show the critical importance of enforcing the Act's requirements of full disclosure of the terms of an assignment to protect the Government. This court refuses to brush aside these requirements and thereby burden defendant with the obligation of investigating each and every facet of a highly complex financing arrangement.

Looking to the totality of the circumstances rather than to the isolated fact of DLA's erroneous payments to American, the court finds that the DLA did not by such payments waive the requirements of the Act. *Tuftco Corp. v. United States,* 222 Ct.Cl. 277, 287, 614 F.2d 740, 746 (1980); *American Financial Associates, Ltd. v. United States,* 5 Cl.Ct. 761 (1984), *aff'd,* 755 F.2d 912 (Fed.Cir.1985).

Further, the court finds that plaintiff has wholly failed to meet its burden of establishing that it gave adequate notice to DLA, provided copies of the actual doc-

uments of assignment or that, with adequate knowledge of the circumstances of this complex arrangement, DLA waived the Act's requirements by making progress payments directly to plaintiff. *Tuftco Corp. v. United States,* 222 Ct.Cl. 277, 287, 614 F.2d 740, 746 (1980). Thus, assuming that plaintiff's complaint is not subject to dismissal because plaintiff is a proper party and has the requisite standing to sue (on behalf of Mercantile Holdings), the court nevertheless will deny plaintiff's motion for summary judgment and order dismissal of its complaint.

### The Counterclaim

Since the court's dismissal of plaintiff's complaint is not premised upon a lack of jurisdiction, the court clearly has jurisdiction to consider defendant's counterclaim. In short, dismissal of plaintiff's complaint pursuant to RUSCC 12(b)(4) and 56 for failure to state a claim does not have the legal effect of divesting this court of jurisdiction to entertain defendant's counterclaim. *Joseph Morton Co. v. United States,* 3 Cl.Ct. 780 (1983) However, after a careful review of the relevant portions of the parties' briefs relating to defendant's counterclaim, the court has determined to defer its ruling on defendant's counterclaim to allow consideration of the need for further proceedings respecting defendant's counterclaim.

### CONCLUSION

For the foregoing reasons, the court denies plaintiff's motion for summary judgment, and grants in part defendant's cross-motion for summary judgment. The Clerk is ordered to dismiss plaintiff's complaint

---

dent. Apparently, St. Bernice had no other significant source of operating capital or revenues other than the DLA contract.

17. Plaintiff relies solely upon the actions of the administrative contracting officer and the disbursing officer to show that a waiver occurred. Plaintiff does not allege that the contracting officer acted in any manner to waive the requirements of the Act. The record does not establish that the administrative contracting officer or the disbursing officer had actual authority to act for the contracting officer or that the contracting officer subsequently ratified the ac-

tions of any other officials involved. However, defendant failed to raise the issue of lack of authorization in its briefs although this issue would appear to be of some significance in resolving this issue. *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *New American Shipbuilders, Inc. v. United States,* 871 F.2d 1077, 1080 (Fed. Cir.1989); *see H.F. Allen Orchards v. United States,* 749 F.2d 1571 (Fed.Cir.1984), *cert denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985); *Fox Valley Engineering, Inc. v. United States,* 151 Ct.Cl. 228 (1960).

with prejudice. However, the court will defer its ruling upon defendant's counterclaim. A status conference will be scheduled in the near future to discuss further proceedings in this case relating to defendant's counterclaim. As soon as the court has determined the merits of defendant's counterclaim a final order will be entered disposing of defendant's counterclaim and all remaining issues.

