**APPLIED COMPANIES, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 95–639C.

United States Court of Federal Claims.

April 28, 1997.

Peter B. Jones, Irvine, California, for plaintiff

Harold D. Lester, Jr., Washington, D.C., with whom were Assistant Attorney General Frank W. Hunger, Director David M. Cohen and Assistant Director Kirk T. Manhardt for defendant. Major Kelly D. Wheaton, United States Army, of counsel.

## OPINION

LYDON, Senior Judge:

This matter is before the court on the parties' motions for summary judgment. Plaintiff, Applied Companies (Applied), seeks payment of approximately $1.9 million withheld from a settlement agreement between defendant and Applied on an air conditioning contract. This withholding represented the satisfaction by defendant of Applied's prior indebtedness to defendant, resulting from admitted erroneous overpayments to Applied, on a different air conditioning contract. The issue before the court, as framed by the pleadings, is whether defendant's offset was a breach of the parties' settlement agreement. After reviewing the briefs and oral argument, the court denies Applied's motion for summary judgment and grants defendant's cross-motion for summary judgment.

## FACTS

On December 14, 1990, defendant, acting through the Department of the Army (Army), awarded Contract No. DAAK01–91–C–0058 (Contract No. 0058) to Applied, a California corporation, for the accelerated delivery of first article testing and production of 1,000 air conditioners for the Army. On July 12, 1991, defendant terminated Contract No. 0058 for alleged default. Applied appealed the default termination to the Armed Services Board of Contract Appeals (ASBCA) and in March 1994, the ASBCA converted the default termination into a termination for convenience. In February 1995, the parties entered into a termination settlement agreement through which defendant was to pay

Applied $2,818,931.34. Defendant has paid only $911,604.11 of the settlement amount and asserts the remainder, $1,907,327.23, has been used to offset erroneous overpayments made previously to Applied under another contract. Applied contends that defendant's set off is a breach of the parties' termination settlement agreement.

In addition to Contract No. 0058, two prior contracts between Applied and defendant figure prominently in this case. The Army awarded Applied Contract No. DAAK01–85–D–B013 (Contract No. B013) in August 1985 and Contract No. DAAK01–86–D–C072 (Contract No. C072) in September 1986 for the purchase of air conditioners by the Army.

### Contract Nos. C072 and B013

In April and May 1992, defendant made overpayments identified as payments under Contract No. C072 in the amount of $1,399,-005.19. Applied notified defendant by letters dated April 20, 1992 and May 7, 1992 that Applied had received the overpayments and that it intended to apply the overpayments to amounts due it under Contract No. 0058. Applied's April 20, 1992 letter informed the Defense Finance and Accounting Service (DFAS) that it had received a check from DFAS in the amount of $855,000, but that in light of Applied's invoice, the check should have only been in the amount of $96,108—an overpayment of $758,892. Applied further informed DFAS that:

> This overpayment has been deposited in Applied accounts and will be credited against the government's current contract obligations to Applied which currently exist in the amount of $7,763,171.

> If this procedure is not acceptable, please inform the undersigned in writing by May 5, 1992.

Similarly, Applied's May 7, 1992 letter informed DFAS that it had received another check from DFAS for $711,236.88, but that the check should have been in the amount of $71,123.69—an overpayment of $640,113.19. Applied further informed DFAS that:

> This overpayment has been deposited in Applied accounts and will be credited against the government's current contract

obligations to Applied which currently exist in the amount of $7,763,171.

Specifically, it is Applied's intent to reflect any overpayment against TROSCOM DAAK01–91–C–0058 claim originally filed in the amount of $4,072,231 . . . .

If this procedure is not acceptable, please inform the undersigned in writing by May 15, 1992.

Without referencing either of Applied's letters quoted above, DFAS, by letter dated May 29, 1992, informed Applied that it owed the government $1,468,538.95 under Contract No. C072.[1] DFAS further advised Applied in its May 29th letter of the government's intent to recoup the overpayments through offsets against monies due Applied. DFAS stated "In addition to charging interest, administrative offset action will be initiated against any unpaid invoices sufficient to cover this indebtedness."

On July 2, 1992, DFAS informed Applied that "Interest is now being charged from the date of our original request letter [May 29, 1992 letter] at the rate of 6.875 percent."

On July 7, 1992, Applied responded:

In reference to the DFAS letter dated July 2, 1992, Applied has relied upon the Government's acceptance of our offer outlined in letters responding to each instance of overpayment.

These overpayments have been deposited in Applied accounts and are credited against the government's current contract obligations to Applied which currently exist in the amount of $7,763,171.

Specifically, it is Applied's intent to reflect any overpayment against TROSCOM DAAK01–91–C–0058 claim originally filed in the amount of $4,072,231 . . . .

Again, if this procedure is not acceptable, please inform the undersigned in writing by July 21, 1992.

Although this letter refers to defendant's "acceptance" of Applied's offer, Applied has not submitted any evidence showing any expression of acceptance by defendant. Indeed, by letter dated July 22, 1992, DFAS informed Applied that the procedure outlined in Applied's July 7, 1992 letter was unacceptable.[2] Applied has not proffered any invoice to DFAS reflecting a setoff of the amounts in issue against amounts DFAS owed plaintiff on any other contract. DFAS reiterated its position in a May 6, 1993 letter to Applied. The letter stated in part:

As previously stated, applying the overpayment on contract DAAK01–86–D–No. C072/0001 to claim(s) against another contract is *unacceptable*. If Applied Companies does not liquidate its indebtedness, through immediate payment in full, or request an installment agreement within 30 days from the date of this letter, we will take the following actions.

In Applied's May 29, 1993 letter, it did not insist that it had already offset the overpayments but instead responded as follows:

Please consider this as a request under F.A.R. 32.613(h) on behalf of Applied Companies to enter into a "Deferred Payment Agreement" which would serve as a bridge to allow the government the right to offset such overpayment against the settlement of claims filed against the Government.

By letter dated June 25, 1993, DFAS denied Applied's request for a "Deferred Payment Agreement" explaining that, "The debt of $1,468,538.95, plus interest (currently $106,-810.50), under contract DAAK01–86–D–No. C072/0001 is the result of erroneous payments by the disbursing officer, and as such, is not subject to appeal or the provisions of FAR Subpart 32.6. Although your company has other cases under appeal, this debt is a separate issue and is not affected by the status of the other contracts." [3]

---

1. As set forth above, the two overpayments to plaintiff amounts to $1,399,005.19 ($756,892 plus $640,113.19). It is not clear from the materials before the court what accounts for the increase in the overpayment figure, but there is some indication in these materials that there were other debts of plaintiff that account for this increase. In any event, the parties do not make an issue of this disparity.

2. The July 22, 1992 letter is not part of the record but is referenced in DFAS's May 6, 1993 letter to Applied.

3. There is no such statement in the record before the court explaining why the government refused Applied's proposed setoff of the Contract No. C072 overpayments against amounts due under Contract No. 0058.

In July 1992, Applied made final delivery under Contract No. B013; after final delivery defendant owed Applied $1,317,050.23. Thirteen months later, in August 1993, the contracting officer for Contract No. B013 reduced the total contract price by $1,365,256 through a series of five unilateral modifications referring to the "definitization of savings under Value Engineering Change Proposal (VECP)." Subsequently, on January 9, 1995, Applied submitted a certified claim to the contracting officer seeking the recoupment of the amounts reduced on Contract No. B013 through the unilateral modifications.[4] On November 27, 1996, the contracting officer denied Applied's claim and on February 19, 1997 Applied filed an appeal of that decision to the ASBCA.

There is no reliable evidence before the court that plaintiff effectively credited the amounts at issue in this case against any government contract obligation to plaintiff. Applied presently advises, as one of its alternatives, that it intends to offset its indebtedness to defendant under Contract No. C072 against the amounts ($1,701,377) it expects to recover in the ASBCA litigation discussed above. It appears that plaintiff's debt to defendant, which arose in May 1992, now exceeds the amount at issue in the ASBCA proceeding if defendant's setoff, at issue in this case, is deemed invalid.

### Contract No. 0058

On July 12, 1991, contracting officer Lorraine M. Jones terminated Contract No. 0058 for alleged default. Applied subsequently appealed the termination for default to the ASBCA. On March 29, 1994, the ASBCA sustained Applied's appeal and converted the default termination of Contract No. 0058 into a termination for convenience.

On May 6, 1994, Applied wrote to the Defense Contract Management Area Operations (DCMAO) requesting "immediate partial payment" under Contract No. 0058. In this letter Applied proposes to set off the amounts due under Contract No. 0058 against "certain 'alleged unliquidated overpayments' in the principle amount of $1,399,-

006 received under contract DAAK01–86–D–No. C072." This letter further provides:

> By a copy of this letter, we are advising the DFAS Finance and Accounting Center in Columbus, Ohio with respect to offset the unliquidated "overpayment" under contract DAAK01–86–D–No. C072 against our application for partial payment under terminated contract DAAK01–91–C–058. This offset should not be construed as a waiver of Applied's right to contest or appeal the assessment of any and all interest charges related to "overpayments" received under contract DAAK01–86–D–C–072. As a matter of equity and fairness such payments should be considered, ab initio, partial payments under the terminated contract.
>
> Although the government has asserted a claim that there has been an "overpayment" on DAAK01–86–D–No. C072, Applied has contended that it is owed funds on this and other government contracts far in excess of the "overpayment". Resting this matter aside, Applied has agreed to this offset as a means of accelerating payments on the terminated contract.

On July 22, 1994, Contracting Officer Jones issued unilateral Modification No. P00007 (Mod.P00007) which acknowledged the ASBCA's decision, increased the contract funding to a total amount of $3,537,020, and assigned Howard S. Arentzoff of the DCMAO as the Termination Contracting Officer (TCO) for Contract No. 0058. Additionally, Mod. P00007 included the following request:

> 5. Because of outstanding unliquidated progress payments on this contract *and overpayments on other contracts*, it is requested that any monies due Applied Companies be offset against their existing debt.

(emphasis added) On September 22, 1994, contracting officer Jones issued unilateral Modification No. P00008 (Mod.P00008) increasing the contract funding to a total amount of $3,778,659. Mod. P00008 also in-

---

4. Applied's January 9, 1995 claim seeks the recovery of $1,701,377 for cancellation of VECP benefits under Contract No. B013. The additional

$336,121 ($1,701,377 minus 1,365,256) was due to an additional reduction through a sixth modification.

cluded the language from paragraph five quoted above.

On or about December 8, 1994, Applied entered into a "Revolving Credit Loan and Security Agreement" (Loan Agreement) with Comerica Bank, with a credit limit of $6,500,-000. Applied used the money borrowed from Comerica to pay preexisting debts to the Bank of California (which was the original lender for Contract No. 0058). As a part of its Loan Agreement, Applied, pursuant to the Assignment of Claims Act, 31 U.S.C. § 3727 and 41 U.S.C. § 15, executed an "Instrument of Assignment," assigning its proceeds under Contract No. 0058 to Comerica. By letter dated December 11, 1994, Applied requested that the DCMAO "Please expedite the *Acknowledgement* of [the assignment to Comerica] as Applied's funding of it's [sic] lines of credit is contingent upon the government's acceptance of the assignments." (emphasis in original) DCMAO acknowledged the assignment on December 14, 1994 and DFAS acknowledged it on February 24, 1995. In a letter to Comerica, DFAS stated the following:

The signature below acknowledges receipt on behalf of the Defense Finance and Accounting Service—Columbus Center. The Assignment was executed at *4:30 p.m.* on *02/24/95* for the below listed contract number(s):

DAAK01–91–C–0058

Acknowledgement of the Notice of Assignment and a copy of the Instrument of Assignment does not constitute approval of any term and condition contained in the Instrument other than those required by federal Acquisition Regulation (FAR) 32.8 or Defense Federal Acquisition Regulation (DFARs) 232.8.

The dollar amount is not a restriction as far as assignments are concerned. We will continue to pay monies on this contract to the assignee until the contract is closed or the assignment is rescinded.

Sincerely,

/s/ Clifford J. Barasch

Acting Associate Director

Finance and Accounting Officer

On February 27, 1995, Arentzoff and Applied's Chief Financial Officer, Kent Fortin, agreed to a gross settlement amount of $3,700,000 and a net settlement of $2,818,-931.34 (after credits for progress payments) to be paid by defendant to Applied for Contract No. 0058. On March 16, 1995, Arentzoff executed Termination Supplement Agreement A00002 (Mod.A00002) memorializing the parties' settlement agreement in the gross amount of $3,700,000 to be paid to Applied. The modification provides in part that "[t]he parties agree to the following,":

(ii) Further, the Government agrees to pay to the Contractor or its assignee, upon presentation of a proper invoice or voucher, the sum of *$2,818,931.34* ..., arrived at by deducting from the sum of *$3,700,-000*..., (A) the amount of *$871,068.66* for all unliquidated partial or progress payments previously made to the Contractor or its assignee and all unliquidated advance payments (with any interest) and (B) the amount of *$10,000* for all applicable property disposal credits ... and (C) the amount of *$-0-* for all other amounts due the Government under this contract, except as provided in paragraph (7) below.

(iii) The net settlement of $2,818,931.34 in subdivision (ii) above, together with sums previously paid, constitutes payment in full and complete settlement of the amount due the Contractor for the complete termination of the contract and of all other demands and liabilities of the Contractor and the Government under the contract except as provided in paragraph (7) below.

Mod. A00002 constituted the full and final agreement of the parties relating to the termination settlement costs for Contract No. 0058. Arentzoff forwarded Applied's invoice to the DFAS for payment with the following, *inter alia*, stamped on the invoice: "Termination Settlement; not subject to discount, offset, or holdback." The purpose of this stamp, avers Arentzoff, is to preclude the disbursing office from applying any prompt payment discount or offsetting unliquidated

progress payments accrued under the terminated contract from the final payment.

On May 5, 1995, defendant paid Applied's assignee, Comerica, $911,604.11 on Applied's invoiced amount of $2,818,931.34. Defendant's "Advice of Payment," identifies $1,907,327.89 of the $2,818,931.34 invoiced amount as an "other deduction" and states "Deduction due to contractor indebtedness." The $1,907,327.89 includes interest pursuant to the Debt Collection Act, 31 U.S.C. § 3717.

By September 20, 1995, Applied had repaid all monies borrowed from Comerica through the Loan Agreement with the proceeds of another loan. Since that date, Applied has not had any outstanding debts to Comerica, either under the Loan Agreement or under any other loans from Comerica to Applied. Comerica has closed the Loan Agreement account, as well as all other loan accounts with Applied.[5]

Applied filed its complaint in September 1995, alleging that "Defendant's deduction of $1,907,328 from the contract payment was a breach of its contract with Applied." Applied seeks payment in the amount of $1,907,-328, together with interest pursuant to the Prompt Payment Act, 31 U.S.C. § 3902, from March 31, 1995 and interest pursuant to the Contract Disputes Act, 41 U.S.C. § 611 from May 31, 1995 until the principal shall have been paid, plus attorney fees and costs pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504.

## DISCUSSION

### 1. Summary Judgment

Summary judgment is appropriate when the pleadings raise no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The moving party bears the burden of establishing an absence of evidence to support the non-movant's case. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144,

157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The party opposing summary judgment has the burden of showing sufficient evidence, not necessarily admissible, of a genuine issue of material fact in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Further, the non-moving party may not discharge its burden by cryptic, conclusory, or generalized responses. *See Willetts v. Ford Motor Co.*, 583 F.2d 852, 856 (6th Cir.1978); *Tunnell v. Wiley*, 514 F.2d 971, 976 (3rd Cir.1975).

When both parties have filed motions for summary judgment, as in this case, the court must evaluate each party's motion on its own merits. The court's duty to decide whether summary judgment is appropriate is not abrogated by the fact that both parties argue in favor of summary judgment and allege that there are no genuine issues of fact for trial. *Prineville Sawmill Co., Inc. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390–91 (Fed.Cir.1987)). The court must evaluate each party's motion independent of the other, and resolve all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors*, 812 F.2d at 1391.

Applied advances four main arguments in support of its motion for summary judgment. First, Applied contends that there was no net overpayment to Applied on which defendant could base a setoff. Second, Applied alleges that defendant's setoff was a breach of the parties' negotiated termination settlement agreement wherein defendant agreed to pay Applied the net amount of $2,818,931.34. Third, Applied maintains that Contract No. 0058's "no-setoff" provision and the Assignment of Claims Act, 31 U.S.C. § 3727; 41 U.S.C. § 15, bars defendant from taking a setoff for liabilities arising independently of the contract. Finally, Applied argues that even if there was an overpayment, defendant's setoff was improper because it never issued a Contracting Officer's final decision

5. Pursuant to the court's July 3, 1996 order Comerica was issued a Notice giving it thirty days to assert any claim or interest in this case. Comerica did not file a complaint or answer asserting

any interest in the subject matter of this suit. It seems clear from the parties' submissions that Comerica does not have any interest in the settlement proceeds in issue.

as required by the Contract Disputes Act and FAR Subpart 32.6 "Contract Debts."

Defendant also advances four arguments in support of its cross-motion for summary judgment. First, defendant argues that Applied is not entitled to rely upon the "no set-off" provision of its assignment to Comerica to preclude defendant's right to offset Applied's outstanding debts against defendant's obligations to Applied. Second, defendant contends that it properly exercised its common-law right to setoff. Third, defendant alleges that the TCO never entered into a binding agreement not to offset Applied's debt to defendant against defendant's payment of Applied's termination settlement costs. Fourth, defendant maintains that it was not required to issue a contracting officer's final decision to recoup erroneous payments through administrative offset that had been made by mistake by defendant's disbursing office.

The court notes that although the gravamen of the complaint is defendant's alleged breach of the settlement agreement, the parties have relegated that issue to the background of their discussion of the dispute. Indeed, at oral argument, Applied's counsel stated that the breach of contract argument was its "last alternative argument." Nevertheless, because the alleged breach is the basis of the complaint the court will address this issue first.

### 2. The Termination Settlement Agreement

■ Applied claims that the parties' settlement agreement required defendant to pay Applied, or its assignee, the full amount of $2,818,931.34 with no setoff. Further, Applied contends that even if there was an overpayment and the government had a right to recoup the funds, that right cannot be invoked here to avoid payment of the agreed to settlement. Consequently, Applied argues that defendant's deduction of $1,907,327.23 from the contract payment was a breach of the settlement agreement. Plaintiff does not challenge the $911,604.11 paid to Comerica out of the settlement figure set forth above.

■ Plaintiff's position creates tension between rights under a settlement agreement and the common law setoff right of a creditor, as espoused by the Supreme Court in *United States v. Munsey Trust Co.*, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947). The Supreme Court stated emphatically that "The government has the same right 'which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him.'" *Id.* at 239, 67 S.Ct. at 1602 (citations omitted). This is not to say, however, that parties cannot provide in their settlement agreement that the amount of the settlement shall not be subject to a setoff of any other debt owed by one party to the other party.

Applied argues that under the settlement agreement defendant agreed to pay Applied a net amount of $2,818,931.34 without any setoff reduction. Applied contends that defendant must be held to that agreement. Applied cites *Bank of America Nat'l Trust & Sav. Ass'n. v. United States,* 23 F.3d 380 (Fed.Cir.1994) in support of its position that defendant's set off was a breach of the parties' settlement agreement. In *Bank of America,* the government entered into a series of contracts with a contractor who assigned his proceeds and rights associated with each contract to the bank as security for loans to finance his performance of the contracts. The bank notified the appropriate contracting and disbursing officers in accordance with the Assignment of Claims Act. The government acknowledged and accepted each assignment. Subsequently, the government terminated two of the contracts for default. After the contractor appealed the terminations for default to the ASBCA the parties negotiated and reached a settlement. Under the settlement agreement the government was to pay the settlement amount directly to the contractor. After the government paid the contractor, the assignee bank filed suit against the government, claiming that the assignment required the government to pay all contract monies to the assignee bank. The government filed a third-party complaint against the contractor seeking return of the money paid under the settlement. *Id.* at 382.

The Federal Circuit rejected the government's attempt to recoup the settlement funds from the contractor because:

> The government's right to recoup erroneously paid funds cannot be invoked by the government as a means to circumvent a legal obligation. In return for [contractor's] agreement to discontinue his action against the government, the government agreed to settle his claims and voluntarily relinquished its right to disturb the settlement. [Contractor] accordingly ceased pursuing his contract claims and the government must likewise be held to its end of the bargain. "The law strongly favors settlement of litigation, and there is a compelling public interest and policy in upholding and enforcing settlement agreements voluntarily entered into."

*Id.* at 383 (citations omitted). Applied's reliance on *Bank of America,* is misplaced. The facts in *Bank of America* are inapposite to those in this case. In *Bank of America* the government entered into a settlement agreement with the contractor that it, in retrospect, should not have. In *Bank of America,* the government sought to recoup funds that it had agreed to pay directly to the contractor pursuant to the terms of the settlement agreement In contrast, the government in this case sought to recover funds which it erroneously paid out under a different contract and not pursuant to the parties' settlement agreement. The Federal Circuit in *Bank of America* held the government to the terms of the settlement because "In the absence of any fraud, misdirection, or concealment, the government may not recover funds paid in good faith and to the satisfaction of the interested parties." *Id.* (citing *McKnight v. United States,* 13 Ct.Cl. 292, 313, 1800 WL 946 (1877), *aff'd,* 98 U.S. 179, 25 L.Ed. 115 (1878)). The government's failure to protect itself in *Bank of America* from liability to the bank when it easily could have, was not reason to allow it to renege on its commitment under the agreement. *Id.* While the government in *Bank of America* voluntarily paid the contractor under the settlement, it did so at its peril because of the government's known or knowable rights of the assignee. In the case at bar the overpayments to Applied were not voluntarily paid pursuant to a settlement agreement and most probably were due to a computer glitch or some other unforeseeable or unintended accident.

*Bank of America* would only support Applied's claim if the settlement agreement actually provided that the $2,818,931.34 was not subject to setoff by any debt of the contractor. The settlement agreement does not so provide. Applied argues that the plain language of the settlement agreement required defendant to pay Comerica without any offset. The government did this. Comerica at no time made any claim to the government that it was due more than the $911,604.11 paid it out of the settlement funds. Had the government paid the entire amount of the settlement to Comerica, plaintiff would have had no basis to complain. The amount of the settlement was plaintiff's money and was subject to the rights of Comerica as assignee. After payment was made to the assignee, then the remainder of the settlement figure was deemed plaintiff's money by the government, and, as such was subject to setoff under *Munsey Trust* unless otherwise specifically excluded from setoff by the language of the settlement agreement.

■ Applied does not dispute the language of the settlement agreement. However, both parties construe the settlement agreement differently. The Federal Circuit has said the "principal objective in deciding what contractual language means is to discern the parties' intent at the time the contract was signed." *Winstar Corp. v. United States,* 64 F.3d 1531, 1540 (Fed.Cir.1995), *aff'd,* — U.S. —, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). Contract interpretation constitutes an objective test, and the standard is what a similarly situated, reasonably prudent contractor would have understood the contract language to mean, not what the drafter or any other party subjectively intended the contract to mean. *City of Oxnard v. United States,* 851 F.2d 344, 347 (Fed.Cir.1988); *Badgley v. United States,* 31 Fed.Cl. 508, 511 (1994).

Applied contends that the following language in ¶ 6(ii) of the settlement agreement required the government to pay the $2,818,931.34 without offset, "Further, the Government agrees to pay to the Contractor or its

assignee, upon presentation of a proper invoice or voucher, the sum of $2,818,931.34 ...." Applied takes this language out of context. The settlement agreement further provides in ¶ 6(iii) that "The net settlement of *$2,818,931.34* in subdivision (ii) above, together with sums previously paid, constitutes payment in full and complete settlement of the amount due the Contractor for the complete termination *of the contract and of all other demands and liabilities of the Contractor and the Government under the contract* ...." (emphasis added). Kent Fortin, Applied's Chief Financial Officer, avers that during the settlement negotiations with Arentzoff, the issue of the overpayments was discussed and that he insisted that any settlement be payable without offset, except for credits of progress payments and advance payments made under Contract No. 0058. Fortin further avers that when he agreed to a settlement of Contract No. 0058 disputes with Arentzoff, he did so with the understanding that defendant's promise to pay $2,818,931.34 meant that defendant would actually pay that amount. On the other hand, the Army had been after plaintiff for three years to repay the debt it owed the Army. Now that the settlement would produce funds that belonged to plaintiff, it seems reasonable, since those funds were in the possession of the Army, that the Army would utilize a setoff as a legally sanctioned procedure to obtain payment of plaintiff's three year old debt to it. This may well explain why the settlement agreement did not state *in haec verba* that the settlement amount would be payable without any offset.

It is not disputed that at the time of the settlement negotiations Arentzoff had knowledge of the PCO's instructions to offset any settlement against prior debt; yet there is no language in the agreement which supports Applied's claim that defendant agreed not to offset Applied's prior debt. The language of the settlement agreement only addresses Applied's rights under Contract No. 0058. The language cited by Applied says nothing about the government's setoff rights with respect to debts arising outside of Contract No. 0058 and contains no language to eliminate those rights.

If Applied understood that the agreement contained the condition that no setoff would be taken against the settlement, it should have insisted that the agreement unequivocally state this. That is precisely what a reasonably prudent contractor would have done before entering into the agreement. It is hard to believe that the settlement agreement would have been signed by Applied, without a provision limiting the government's common law right of setoff, if the parties had reached an agreement on that issue. Indeed, the fact that it is undisputed that both parties were aware of the government's intention to offset any payment under the settlement amount of Contract No. 0058 against the overpayments and the absence of any language in the agreement precluding such offset, strongly suggests that there was no agreement not to offset. More importantly, Applied relies on FAR § 49.109–1 which mandates, "When a termination settlement has been negotiated and all required reviews have been obtained, the contractor and the TCO shall execute a settlement agreement.... The settlement shall cover (a) any setoffs that the Government has against the contractor that may be applied against the terminated contract...." Both parties were aware of the government's potential setoff, thus the parties under the FAR were required to deal with any setoff the government might have against the contractor in the settlement agreement. *See G.L. Christian and Assocs. v. United States,* 160 Ct.Cl. 1, 312 F.2d 418 (1963) (Court read into contract a clause, missing from contract signed by parties, which was required or mandated by regulations to be included in the contract.). The regulation mandated this coverage and the failure of plaintiff to include a setoff prohibition in the settlement agreement cannot serve to abrogate the government's inherent common law right of setoff set forth by the Supreme Court in *Munsey Trust.* If plaintiff wished to have the setoff excluded from the settlement agreement it was incumbent on plaintiff to "cover" it so as to specifically exclude the setoff from the settlement agreement proceeds.

■ Further, Applied contends that the settlement agreement specifically states that the $2,818,931.34 that defendant agreed to

pay was the remainder left after deducting $871,068.66 from the gross settlement amount of $3,700,000. That the settlement agreement accounts for this offset, Applied argues, "can only mean that the promise to pay the remainder meant what it said," i.e., pay $2,818,931.34 without further offset. Applied's interpretation exceeds the four walls of the agreement. This assertion by Applied brings into play the maxim of legal interpretation, *expressio unius est exclusio alterius*—the expression of one term is the exclusion of another. The settlement agreement only provides that defendant will not take further offsets against the settlement amount of $2,828,931.34 for any debts that arose under Contract No. 0058, it contains no restriction of offsets for debts arising outside of Contract No. 0058.

Additionally, Applied submits Fortin's affidavit as evidence of a meeting of the minds between Applied and defendant on the no setoff issue. As a general rule, parol or extrinsic evidence antecedent or contemporaneous to the contract at issue is inadmissible to vary, contradict, or add to the terms of an integrated contract. *Nicholson v. United States*, 29 Fed.Cl. 180, 193–95 (1993) (citing CORBIN ON CONTRACTS § 573, at 357; WILLISTON ON CONTRACTS § 631, at 948). The longstanding rule for determining integration is that where the terms on the whole are complete and specific, the written contract "is presumed, in law, to express the final understanding of the parties. If the contract did not express the true agreement, it was the claimant's folly to have signed it." *Brawley v. United States*, 96 U.S. 168, 173, 24 L.Ed. 622 (1877). In the case at bar the settlement agreement represents an integrated contract which pursuant to the plain meaning rule, precludes the introduction of extrinsic evidence to vary the explicit terms of the agreement. Notwithstanding the parol evidence rule, the court may use extrinsic evidence for the limited purpose of shedding light on the parties' objective intent by clarifying the circumstances affecting a contract or the meaning of terms found within the four corners of the contract itself. Nevertheless, contract interpretation, with or without extrinsic evidence, may never be used to discern or confirm the unilateral subjective

intent of one or more of the parties. *Huna Totem Corp. v. United States*, 35 Fed.Cl. 603, 610 (1996).

With regard to Applied's claim that the parties agreed not to offset the $2,818,931.34 against the overpayments, Arentzoff does not dispute that he was aware of the PCO's request in modifications P00007 and P00008 to offset any monies due under Contract No. 0058 against the overpayment. However, Arentzoff avers that "the parties made no agreement during negotiations or in the language of the termination settlement modification contrary to these instructions." Had plaintiff "covered" the setoff as required by FAR § 49.109–1, discussed earlier, this dispute would not have arisen. The documents submitted by defendant indicate that the government had been trying to recoup the overpayments made under Contract No. C072 from the time they were made, a period of some three years. The documents further show Applied's continuous efforts to avoid repayment by suggesting its intent to setoff its debts against monies that the government would owe Applied under other contracts. This "intent" was never manifested by any payment invoice Applied sent to the government or any manifestation by the government that it had recognized such setoff. Under these circumstances, Applied, at the least, should have bargained to have a provision incorporated into the settlement agreement explicitly providing that the $2,818,-931.34 was not subject to offset by any amounts due the government under any contract.

Therefore, in the absence of a provision in the settlement agreement restricting the government's inherent common law right to setoff, the court declines to rewrite the terms of the settlement agreement to limit such a right. To do otherwise, under the facts of this case, would serve to weaken the well settled holding of the Supreme Court in *Munsey Trust.* Accordingly, the court rejects Applied's claim that the government breached the terms of the settlement agreement by offsetting Applied's debt.

### 3. Common Law Right of Setoff

Alternatively, plaintiff argues that there was no net overpayment for the gov-

ernment on which it could base a setoff because Applied had previously extinguished its debt under Contract No. C072 by applying the overpayments against the government's alleged debt to plaintiff under Contract No. B013. Applied claims that it has no fewer rights than defendant to setoff funds against all accounts due it. Applied relies on *Mazama Timber Products, Inc. v. United States*, 6 Cl.Ct. 87 (1984), in support of its right of setoff. In *Mazama* this court stated:

> The setoff right belongs "to every creditor, to apply the appropriated moneys of his debtor, in his hands, in extinguishment of the debts due him." *United States v. Munsey Trust Co.*, 332 U.S. 234, 239[, 67 S.Ct. 1599, 1602, 91 L.Ed. 2022] (1947). (Emphasis added.) Offsets are available to any debtor/contractor who also acts as a creditor. This includes the government, a private contractor, and a public contractor.

*Id.* at 88–89. Applied is correct that it may utilize a common law right of setoff against the government in appropriate situations. But the government too, like any creditor, has the right to setoff a contractor's debts against payments due the contractor. The government's setoff right arose first. It is not necessary to determine what advantage, if any, it provides the government if priority of competing setoffs were at issue. The flaw in plaintiff's argument as presented is that plaintiff has not established that at the time the government properly exercised its setoff rights plaintiff had previously exercised a valid setoff.[6]

Applied's Chief Financial Officer, Kent Fortin, avers in his affidavit in support of Applied's motion for summary judgment, that in July 1992, he applied the overpayments under Contract No. C072 to the debt

owed by defendant under Contract No. B013. Thus, Applied argues, that in July 1992, it had extinguished its debt arising out of the overpayments, Indeed, Applied argues, defendant owed a net balance, after Applied took the setoff, of approximately $78,000 for the air conditioners delivered under Contracts Nos. B013 and C072.

While Applied now argues that it had setoff, in July 1992, the overpayments it received under Contract No. C072 to the debt allegedly owed by defendant to plaintiff under Contract No. B013, Applied offers no supporting documentation of its claim. Contrary to Applied's claim, the documents in evidence indicate that Applied had not setoff the overpayments. For example, in a July 15, 1993 letter to DFAS—one year after the purported setoff—Fortin, who avers he made the offset, wrote, "Applied has notified the government in all four previous letters *of our intent* to credit the overpayment against other government contract claimed accounts receivable." (emphasis added). Similarly, Applied's August 13, 1993 letter provides:

> As an alternative to further litigation regarding this matter, Applied may propose other options for the "overpayment" alleged by the government,[7] a fact to which Applied does not agree as is evidenced by Applied's original notice to the government crediting the funds against amounts due from the government on ATCOM contracts.

Applied, however, contends that these letters are "no more than the predictable response of a small business to the Government's oppressive conduct," and that Applied did in fact offset the overpayments. Notwithstanding Applied's characterization, it is essentially unrefuted that the government did not

6. Parenthetically, it is noted that defendant's setoff was based on a clear, established debt which plaintiff owed the government. It was a debt plaintiff acknowledged and it preceded any established and acknowledged debt of the government to plaintiff Indeed, plaintiff has not established at this time a viable debt for setoff purposes and the government has not acknowledged any such debt. While plaintiff claims the government owed it $1,317,050.23 under Contract No. B013 after final delivery in July 1992, the fact remains the government denied plaintiff's right to this amount, which action resulted

in the ASBCA litigation referred to earlier in the main text.

7. In Applied's letters of August 13 and 30, 1993, it refers to the "alleged 'overpayment.'" Previously, Applied did not contest that the monies it had received under Contract No. C072 were overpayments. Indeed, in Applied's earlier letters to DFAS quoted in part above, Applied, without qualification, refers to the monies as overpayments. See letters dated April 20, 1992 and May 7, 1992 from Applied to DFAS set forth in the main text.

accept Applied's proposal to offset. Indeed, the documents in evidence indicate that the government had early on expressed its intention to take measures to recoup the overpayments if Applied did not repay the money.

Applied argues that the setoff of the overpayments under Contract No. C072 against defendant's debt under Contract No. B013 "was precisely described" in Fortin's August 28, 1993 letter to DFAS and that "[n]o clearer or more definitive notice of the set off can be postulated." Applied's notice of offset, submitted thirteen months after the purported offset, provides:

Reference: DAAK01–85–D–B013
 DAAK01–86–D–No. C072

Subject: Contract Status/Payment Analysis As of July 31, 1993

Gentlemen:

As committed to DFAS in Applied's letter dated July 20, 1993 analysis' [sic] of DAAK01–75–C–B01 1, we have completed the analysis of the remaining two contracts with ATCOM (L.Jones).

The contract payment analysis enclosed on the contracts reflects an unpaid balance due Applied of $21,905.02 as of July 31, 1993:

DAAK01–85–D–B013 (all) $1,280,349.19
DAAK01–86–D–No. C072 (all) ($1,258,444.17)
 Net due Applied $21,905.02

After a review has been completed, forward a copy of the DFAS analysis for our review and reconciliation with the production records at DCMAO–Van Nuys. However, two days later, on August 30, 1993, Applied wrote to DFAS and proposed to "release the government from all obligations under the case related to contract A080 [still another contract Applied had with the Army] in return for which our obligation to return the alleged 'overpayment' will be dropped." Applied had a claim for $1,891,576 pending under Con-

tract No. DAAJ01–85–C–A080 before the ASBCA. On October 25, 1993, defendant wrote in response to Applied's August 30, 1993 proposal that it "can not consider this offer because the government does not have an obligation to Applied pending the issuance of the decision by the ASBCA." This last sentence has reference to plaintiff's claims under Contract No. B013 before the ASBCA, discussed previously, in which plaintiff also "intends" to offset its debt to the government if the ASBCA finds in its favor. Once again plaintiff "intends" to offset the Contract No. C072 overpayments—debts plaintiff owed the government since May 1992.

■ The court finds that Applied has failed to establish that it offset the overpayments under Contract No. C072 against the government's alleged debt under Contract No. B013. Whether the government has a debt to Applied under Contract B013 is in dispute and is currently in litigation at the ASBCA. Thus, Applied's assertion that it had extinguished its debt to the government through offset is without any factual foundation. Accordingly, the court finds no merit to Applied's claim that there was no net overpayment against which the government could base a setoff.[8]

### 4. The Assignment of Claims Act

■ Again, alternatively, Applied asserts that the Assignment of Claims Act (Act), 31 U.S.C. § 3727; 41 U.S.C. § 15, required the government to pay Applied, or its assignee, Comerica, the amount of $2,818,-931.34 without setoff. The Act expressly limits the government's right to set off a contractor's debts against payments to an assignee.[9] The Act does not protect plaintiff,

---

**8.** Additionally, the court rejects Applied's argument that defendant's setoff was improper because it was not predicated upon a contracting officer's final decision. First, the court notes that Applied did not base its purported setoff on a contracting officer's final decision. Second, this court has previously recognized that "defendant's right to recover funds paid under a mistake of fact is an inherent right supported by case law and not subject to the Contract Disputes

Act." *See Consortium Venture Corp. v. United States,* 5 Cl.Ct. 47, 52 n. 8 (1984), *aff'd,* 765 F.2d 163 (Fed.Cir.1985).

**9.** The Act, 41 U.S.C. § 15, provides in part as follows:

 No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party,

an assignor, from setoff. The purpose of the Act is to make it easier for contractors to finance performance of their obligations to the government. *Bank of America*, 23 F.3d at 385 (citing *Produce Factors Corp. v. United States*, 199 Ct.Cl. 572, 580, 467 F.2d 1343, 1348 (1972)). This court and its predecessor, the Court of Claims, has long recognized that an assignee to the proceeds of a government contract under the Act is entitled to sue the government in order to recover for work performed by the contractor. *See, e.g., Merchants Nat'l Bank v. United States*, 231 Ct. Cl. 563, 689 F.2d 181 (1982); *Tuftco Corp. v. United States*, 222 Ct.Cl. 277, 614 F.2d 740 (1980); *First Nat'l City Bank v. United States*, 212 Ct.Cl. 357, 548 F.2d 928 (1977); *Thomas Funding Corp. v. United States*, 15 Cl.Ct. 495 (1988); *Florida Nat'l Bank v. United States*, 5 Cl.Ct. 396 (1984). However, an assignee's recovery from the government is limited to the extent of that assignor's outstanding debt to the assignee. *American Nat'l Bank & Trust Co. v. United States*, 22 Cl.Ct. 7, 13 (1990). Moreover, in order for an assignment to a financing institution to be valid under the Act, the funds secured by the assignment, even if not necessarily used in the performance of the contract itself, must have been available for use by the contractor in performing the contract assigned to the financing institution. *First Nat'l City Bank*, 212 Ct.Cl. 357, 548 F.2d 928 (1977).

Contract No. 0058 incorporates by reference Federal Acquisition Regulation (FAR) clause 52.232–23 "ASSIGNMENT OF CLAIMS (JAN 1986)" with its "ALTER-NATE I (APR 1984)" which are based on the Act. The regulation provides in part as follows:

ASSIGNMENT OF CLAIMS (JAN 1986)

(a) The Contractor, under the Assignment of Claims Act, as amended, 31 U.S.C. 3727, 41 U.S.C. 15 (hereafter referred to as 'the Act'), may assign its rights to be paid amounts due or to become due as a result of the performance of this contract to a bank. . . .

(b) Any assignment . . . authorized under the Act and this clause shall cover all unpaid amounts payable under this contract.

Alternate I (APR 1984) . . . .

Unless otherwise stated on this contract, payments to an assignee of any amounts due or to become due under this contract shall not, to the extent specified in the Act, be subject to reduction or set off.

The inclusion of "no set-off" clauses, such as the one quoted above, ensures assignees a steady stream of payments unaffected by the contractor's potentially numerous obligations to the government not imposed by the contract from which the payments flowed. *Bank of America*, 23 F.3d at 385 (citing *Central Bank v. United States*, 345 U.S. 639, 643, 73 S.Ct. 917, 919, 97 L.Ed. 1312 (1953)).

 Applied, as assignor, is not protected from setoff under the Act. No case has been cited, and none has been found where a contractor/assignor was held entitled to use the "no set-off" provision to preclude the government from exercising its common law

and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States are concerned. All rights of action, however, for any breach of such contract by the contracting parties, are reserved to the United States.

The provisions of the preceding paragraph shall not apply in any case in which the moneys due or to become due from the United States or from any agency or department thereof, under a contract providing for payments aggregating $1,000 or more, are assigned to a bank, trust company, or other financing institution, including any Federal lending agency: *Provided,*

\* \* \* \* \* \*

3. That unless otherwise expressly permitted by such contract any such assignment shall cover all amounts payable under such contract and not already paid, shall not be made to more than one party, and shall not be subject to further assignment, except that any such assignment may be made to one party as agent or trustee for two or more parties participating in such financing;

4. That in the event of any such assignment, the assignee thereof shall file written notice of the assignment together with a true copy of the instrument of assignment with (a) the contracting officer or the head of his department or agency.

right of setoff against the contractor. The "no set-off" provision in the Act protects an "eligible assignee" against setoffs for the assignor's debts to the government unrelated to the assigned contract. *First Nat'l City Bank*, 212 Ct.Cl. at 365, 548 F.2d at 933. Comerica, the assignee in this case, asserts no interest to the funds in question, and rightly so. It is undisputed that the loan which Applied's assignment to Comerica was intended to secure was fully paid on September 20, 1995, five days before Applied filed suit. Additionally, as of September 20, 1995, all of Applied's accounts with Comerica have been closed, and Applied no longer owes any money to Comerica, either through the loan to which Contract No. 0058 payments were assigned or through any other loan. Because Applied has paid its assignee, Comerica, in full, the "no set-off" provision of the assignment is no longer enforceable.

Moreover, the loan from Comerica was not used in the performance of Contract No. 0058. Comerica did not make its loan to Applied until more than three years after Contract No 0058 had been terminated. Furthermore, prior to September 1994, Applied had no loans with Comerica and had never borrowed any money from Comerica. In *First Nat'l City Bank*, the Court of Claims stated:

> The objective of the 1940 Act was to authorize the financing of individual government contracts in the sense that Congress wished the holder of such a pact to be free to receive financial help in performing his agreement in reliance on the security of the expected government payments from that contract. At the same time Congress did not, we think, wish to eat into the Government's normal right of setoff against the assignor more than would be necessary to induce such monetary aid in performing. *Where a contract has been fully completed, further aid is not needed for that contract and there is no occasion to give up the right of setoff.* [I]t is crystal clear that in the court's view the assignment would be defeated if the lender had reason to know in advance that the loan proceeds could not be used in completing the contract.

*Id.* at 367–68, 548 F.2d at 934–35 (emphasis added; citation omitted). Although the loan need not be tied to a particular contract, if the contract has been fully performed before the loan was made, or the contract terminated over three years before the loan was made, the lender cannot rely upon the "no set-off" provision of the contract. *Id.* at 368, 548 F.2d at 935. *See Manufacturers Hanover Trust Co. v. United States*, 218 Ct.Cl. 563, 571, 590 F.2d 893, 897 (1978) (holding that an assignee cannot avail itself of the benefits of the Act when the assignment it received was not given to secure loans relating to the present contract or to any other previously unsecured government contract loan.). Accordingly, Applied, in any event, cannot avail itself of the "no set-off" provision of the Act under the circumstances of this case.

Assuming plaintiff was successful in this lawsuit and the court held it was entitled to recover, this would mean the plaintiff still owes the government at least $1,399,005 plus interest from May 1992. Plaintiff's offset theory seems to be that if it is successful in the ASBCA litigation under Contract B013 it would then offset against any such recovery the amount it owes the government for the Contract No. C072 overpayments. The court surmises that plaintiff emphasized in its presentation its setoff argument instead of its breach of contract argument because of the interest plaintiff would have to pay for holding the government's money it received in April and May 1992 and which it held until May 5, 1995 when the government exercised its right of setoff. If the court were to recognize plaintiff's purported July 1992 setoff, plaintiff would owe much less interest than it actually paid when the government setoff the overpayments against the Contract No. 0058 settlement amount in May 1995. If plaintiff had in fact properly offset the Contract No. C072 overpayments against the government's purported debt under B013 in July 1992, there ostensibly would not have been any setoff by the government in 1995 from the amount of the settlement agreement and there would be no basis for the instant litigation. By not granting plaintiff recovery here, the court in no way precludes plaintiff's right to recover any monies that may be

owed to it under Contract No. B013. However, by denying plaintiff's recovery here, the court prevents plaintiff from having the potential of never having to pay its debt to the government which arose in early 1992.

## CONCLUSION

For the foregoing reasons, the court denies plaintiff's motion for summary judgment, and grants defendant's cross-motion for summary judgment. The Clerk is ordered to dismiss plaintiff's complaint. No costs.